## COMMONWEALTH *vs.* ALLISSA PUGH.

Worcester. November 9, 2011. - June 15, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Practice, Criminal,* Required finding. *Wanton or Reckless Conduct. Parent and Child,* Duty to prevent harm. *Constitutional Law,* Right to refuse medical treatment.

At the jury-waived trial of an indictment charging involuntary manslaughter for the unintentional death of the defendant's viable fetus during an unassisted childbirth, there was insufficient evidence to sustain the defendant's conviction on the basis that she acted recklessly and wantonly in disregard of a substantial risk of harm to the baby by using a significant amount of force to effect the delivery, where, by an objective measure, given the absence of any evidence of an alternative, more reasonable course of conduct during childbirth, she could not be said to have chosen to run the risk rather than alter her conduct so as to avoid the act or omission that caused the harm [496-498]; and where, by a subjective measure, given that there was no evidence the defendant knew the baby was in a breech presentation at any time before the childbirth process was in its final stage, any knowledge of the risk of harm to herself or the baby did not change the physical alternatives available to her [498-499]; further, the evidence was insufficient to establish beyond a reasonable doubt that any act of force by the defendant caused the baby's death [499-500].

At the jury-waived trial of an indictment charging involuntary manslaughter for the unintentional death of the defendant's viable fetus during an unassisted childbirth, there was insufficient evidence to sustain the defendant's conviction on the basis that she acted recklessly and wantonly in disregard of a substantial risk of harm to the baby by failing to summon medical assistance, where, in light of the judge's finding that it was speculative and thus not proved that the baby would have lived if the defendant had called for help, the defendant's failure to summon medical assistance could not be the legal or proximate cause of the baby's death. [500-501]

In an appeal from a conviction of involuntary manslaughter for the unintentional death of the defendant's viable fetus during an unassisted childbirth, this court declined to recognize the existence of a common-law duty of a woman undergoing unassisted childbirth, with no reason to suspect complications at the outset, to summon medical assistance, even where the failure to do so might result in unintentional harm to a viable fetus. [501-510]

INDICTMENT found and returned in the Superior Court Department on June 19, 2007.

The case was heard by *Peter W. Agnes, Jr.*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jaclyn R. Greenhalgh* (*Peter L. Ettenberg* with her) for the defendant.

*Ellyn H. Lazar-Moore*, Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Alexa Kolbi-Molinas*, of New York, & *Sarah Wunsch* for American Civil Liberties Union & another.

*Jane Larmon White*, Committee for Public Counsel Services, for Committee for Public Counsel Services.

*McKenzie E. Webster* for Massachusetts Association of Criminal Defense Lawyers.

*Andrea C. Kramer, Melissa Garlick, Kelly N. Griffin, Victoria Fernandez, & Carolyn G. Goodwin* for Women's Bar Association of Massachusetts.

LENK, J. We are asked to consider whether a woman in the midst of unassisted childbirth may be held criminally responsible for the unintentional death of her viable fetus. In 2009, after a jury-waived trial, a judge in the Superior Court found the defendant guilty of involuntary manslaughter for "inflicting fatal injuries on a viable and near full term fetus during the birthing process" in violation of her "legal duty . . . to refrain from wanton or reckless acts committed against her own viable fetus." Specifically, the judge concluded that the defendant committed wanton or reckless acts by using "a significant amount of force" to bring about the delivery, and by failing to summon medical help on realizing she was giving birth in the "breech" position, see note 5, *infra*, thereby disregarding a substantial likelihood of harm. See G. L. c. 265, § 13; *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990). The judge sentenced the defendant to two and one-half years in a house of correction, followed by a term of probation, but allowed the defendant's motion to stay execution of the sentence pending appeal. The defendant appealed, and we transferred the case from the Appeals Court on our own motion.

On appeal, the defendant claims that (1) the evidence was

legally insufficient to support her conviction of involuntary manslaughter because the Commonwealth did not prove that the baby died as a result of injuries caused by the defendant applying a significant amount of force to bring about the delivery; (2) the judge erred in imposing a criminal law duty on a woman in childbirth to seek medical assistance; and (3) even if such a duty exists, the judge erred in concluding that the defendant, in breaching that duty, disregarded a substantial risk of harm to the fetus when she decided to give birth unaided.

We conclude that the evidence is insufficient to convict the defendant on the theory that she was wanton or reckless in her acts of commission (i.e., exerting force to bring about the birth), because the Commonwealth failed to prove that, once she decided to give birth unassisted, the defendant had any alternative safe course of action. Additionally, we conclude that, in light of the judge's findings that the Commonwealth had not proved that the baby was born alive, or that summoning medical assistance would have saved the baby's life, there is insufficient evidence that the defendant's act of omission (i.e., failure to call for assistance) was the legal or proximate cause of the baby's death.

Finally, because the matter is of significant public importance, has been thoroughly briefed,[1] and may recur in future cases, see *Commonwealth* v. *Washington W.*, 457 Mass. 140, 142 n.3 (2010), *S.C.*, *ante* 204 (2012), we consider the question of duty and decline to recognize a duty of a woman, in these circumstances, to summon medical assistance, breach of which may give rise to criminal liability for involuntary manslaughter. As we explain more fully below, existing criminal laws proscribing murder, most late-term abortions, and the neglect and abuse of children appropriately protect the State's interests in safeguarding viable fetuses and living children without the need to subject all women undergoing unassisted childbirth to possible criminal liability. Imposing a broad and ill-defined duty on all women to summon medical intervention during childbirth would trench on

---

[1]We acknowledge the amicus briefs of the American Civil Liberties Union and the American Civil Liberties Union of Massachusetts; the Committee for Public Counsel Services; the Massachusetts Association of Criminal Defense Lawyers; and the Women's Bar Association of Massachusetts in support of the defendant.

their "protected liberty interest in refusing unwanted medical treatment." *Cruzan* v. *Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). Moreover, such a duty is inchoate and would be highly susceptible to selective enforcement.

Accordingly, we reverse.

1. *Facts and procedural background.* a. *Evidence at trial.* The defendant challenges the sufficiency of the evidence, which we review in the light most favorable to the Commonwealth. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676 677 (1979). The defendant was alone during the salient events surrounding the delivery and did not testify at trial. She had been questioned by police in three separate interviews conducted within one week of the delivery. One of the officers present during the nine hours of recorded interrogation testified at trial as to the defendant's description of the events. The entirety of the videotape was also in evidence. We summarize the defendant's statements based on the officer's testimony and our own review of the videotape.

At the time of the delivery, the defendant was twenty-eight years old, worked as an attendant at an animal hospital, and was the mother of an eight year old boy.[2] She lived with her son, her boy friend (who was also her son's father), and her boy friend's aunt.

The defendant stated that, in October, 2006, after not having menstruated since August, she determined from a home preg-

---

[2] The defendant's first son was born on July 4, 1998. The defendant stated during the course of interrogation that she had gained ninety-three pounds during her first pregnancy, but only gained fifteen pounds during her recent pregnancy. The two pregnancies also differed markedly in other respects. While in the womb, her first child "kicked" often, whereas she experienced no such "kicks" during her more recent pregnancy. Her first child was born three days before his due date. At the outset of this birth, medical staff at the hospital had to break the defendant's "water" for her, as it would not break naturally. The birthing process with her first child took place over approximately eight to nine hours, and the defendant was informed that she might need a cesarean section to end the lengthy childbirth. Nonetheless, after pushing for over two hours, she was able to push the baby out herself without the operation. She did, however, require an episiotomy — a surgical enlargement of the vulval orifice — to complete the otherwise natural childbirth. As to the second birth, the defendant told police that the time between when she felt contractions and the birth was a few hours, and that the delivery occurred in a matter of "minutes" after her water broke.

nancy test that she was pregnant.[3] She told no one. On January 2, 2007, the defendant went to work at noon. At approximately 3 P.M., she began to feel pain in her stomach that she thought might be contractions. Based on how long she thought she had been pregnant, the defendant, according to her statements, believed she was having a miscarriage. On returning home at 4 P.M., she informed her boy friend and his aunt that she was not feeling well and went to her bedroom. She lay down on her bed, and moved from the bathroom to the bed several times over the course of approximately thirty minutes. Eventually, she sat on the toilet. Fifteen minutes later her "water" broke.[4]

The defendant stated to the police, "It wasn't until I sat down and my water broke that I knew what was happening." She then reached inside herself and felt a foot. From a birthing class she had attended during her first pregnancy, eight years earlier, the defendant knew this meant the baby was presenting in a "breech" position, a presentation which could create complications for the delivery and commonly results in cesarean sections.[5] The defendant pushed approximately ten times and pulled on the baby's feet, legs, and body to hasten the delivery; she stated during the interviews that she thought that a breech baby would have a better chance of survival if the delivery occurred as quickly as possible.[6] After approximately five minutes

---

[3]The defendant told police officers that her menstrual periods were irregular and often occurred months apart, and that her last period before August, 2006, occurred in April, 2006. She also stated during the interrogations that, save for one occasion, she had not seen a doctor since giving birth to her first child eight years earlier, had sought medical assistance for her first child only once since his birth, and did not have medical insurance.

[4]The judge took judicial notice of the fact that, "while inside the mother's uterus, a fetus resides in a doublewalled sack of amniotic fluid commonly referred to as the 'bag of waters' [and] prior to the birth of a baby this bag or sack ruptures . . . which releases the amniotic fluid through the mother's vagina, and that this event is commonly referred to as the breaking of the mother's water."

[5]A breech position refers to the orientation of the baby during delivery. In a normal delivery, a baby's head is the first part of the body to present itself outside of the woman's body. In a breech presentation, the lower half of the body and the bottom of the legs present first. The defendant's delivery was a "footling" breech, that is, the baby's feet presented first.

[6]The defendant told the interrogating officers: "I grabbed the foot, and very quickly, another leg came out, and I grabbed on having half, maybe not all of

of this combined effort, the baby fully emerged from the defendant's body.

The baby was blue. The defendant stated that she tried scooping out the baby's mouth and made repeated attempts at rescue breaths, but the baby's color never changed and the baby never appeared to cry or move.[7] Despite her efforts, the defendant could not resuscitate the baby. She disposed of the baby's body in the trash. During the delivery and immediately thereafter, she did not call for help or seek emergency medical assistance. On discovery of the mangled body several days later, a police investigation led officers to the defendant.

Three medical experts testified at trial: the prosecutor called Dr. Henry Nields, acting chief medical examiner for the Commonwealth of Massachusetts, and Dr. Drucilla Roberts, a perinatal pathologist at Massachusetts General Hospital; the defendant called Dr. Richard T. Callery, chief medical examiner for the State of Delaware. Because the medical testimony provides relevant context for findings as to the baby's cause of death, we recite it in detail.

Nields, who performed the autopsy, described the baby as a "full-term male infant." He testified to evidence of both ante mortem and post mortem injuries on the body, though for a number of injuries Nields could not determine conclusively whether they occurred ante mortem or post mortem.[8] Ante mortem injuries, he testified, were characterized by the presence of blood, which "indicates that the heart was beating at the time of that injury," and that the baby therefore must have been alive when the injuries occurred. These injuries included contusions to the baby's scalp, neck, liver, abdomen, testicles, and diaphragm. The ante mortem injuries "could have been sustained either during delivery or shortly after delivery," but "[i]t would be extraordinarily unlikely for those to have been sustained in utero." Nields concluded that

half, of the legs, then a little bit more. I pushed, and I held trying to help the baby out. I was pushing and pulling, and within minutes it all was . . . . I just knew he was coming out upside down, and I just thought if I got him out quicker there was more chance."

[7]The defendant stated that she heard a "gurgling" sound when she breathed into the baby's mouth during her attempts at rescue breathing.

[8]The judge viewed photographs, which were admitted in evidence, of each of the injuries described by Dr. Henry Nields.

the baby had been alive in utero, after leaving the uterus, and while in the birth canal. However, he could not "tell for certain" that the baby was alive after he left the birth canal.[9] The cause of death, according to Nields, was "peripartum injuries of uncertain etiology"; that is, the injuries occurred around the time of the birth, either before, during, or immediately after delivery. He was also unable to determine which, if any, of the injuries resulted in death. According to Nields, the manner of death was "undetermined." Finally, Nields testified that it is "possible," but not certain, that the baby would have lived if the defendant had sought medical attention during the birth.

Roberts described the baby as "near-term," at approximately thirty-six and one-half weeks of gestation. Like Nields, Roberts concluded that the presence of hemorrhaging evidenced injuries sustained while the baby was alive. Roberts testified that the hemorrhaging present in the baby's ante mortem injuries was "impossible to have occurred in utero"[10] and instead "occurred during the intrapartum events" — that is, before, during, and immediately after the birth — on the basis of the large quantities of blood present in the tissue. Specifically, Roberts testified that the baby's abdominal injuries were indicative of a "huge amount of force," and that, while it was "possible" that the abdominal injury was caused by an individual's hand during delivery, it was "much more likely" that it occurred postdelivery from either a significant fall or some other compression injury. Her conclusion was that the baby was "definitely" alive in utero, was also alive during labor, and had a "heartbeat once the entire body was out of the mother's birth canal."[11] She testified that the baby's "probable" cause of death was trauma, hemorrhage,

---

[9]Nields described air found in the baby's lungs as potentially indicative of a live birth. According to Nields, the partial aeration of the baby's lungs and the air in his gastric system was consistent with the baby both breathing and swallowing air. On cross-examination, he testified that this aeration also was consistent with the rescue breaths the defendant said she had performed on the baby.

[10]Such "massive" hemorrhaging could only occur in utero, according to Dr. Drucilla Roberts, if the pregnant woman suffered similarly catastrophic injuries.

[11]Roberts testified that three principal indicia of live birth were the presence of milk in the stomach, air in the lungs, and hemorrhaging in the tissue. She stated that it was "possible" but "not probable" that the air was present in the lungs from the defendant's "rescue breath" efforts. See note 19, *infra.*

suffocation, and exposure. Finally, she averred by way of a hypothetical that if medical attention had been sought when labor was recognized,[12] and "certainly before head entrapment,"[13] then "likely a live birth would have ensued," even though Roberts did not know how long it would have taken for medical personnel, had they been summoned, to arrive at the defendant's home.[14]

Callery, the defendant's medical expert, testified that he could not state "to a degree of reasonable medical certainty" whether the baby was born alive.[15] According to Callery, the body had sustained too much intervening post mortem trauma for him to be able to differentiate between ante mortem and post mortem injuries with any certainty, and therefore such distinctions were "not scientifically sound."[16] In contrast to the testimony of Nields and Roberts, Callery opined that the presence or absence of hemorrhaging was not, in itself, indicative of whether an injury occurred ante mortem or post mortem because "[b]lood doesn't go away when you die . . . . It's still in the tissues." He also characterized the air in the baby's lungs as not neces-

---

[12]Roberts testified that she could not know when labor was recognized in this case but admitted that childbirth is "a very unique event" and, therefore, "recognition may be clouded." She also stated that the defendant's symptoms were the same as those the defendant might have experienced if she were having a miscarriage.

[13]Roberts described the complications associated with a breech presentation of a baby during delivery. According to her, an unassisted breech delivery creates a risk of "entrapment" of the baby's head, meaning the head becomes stuck in utero with the umbilical cord compressed by the cervix. The compression of the umbilical cord combined with the inability of the baby to breathe independently creates a risk of death. Roberts testified that if a woman did nothing (i.e., did not push or pull) during such a delivery, "there's a wide range of possibilities" as to what could occur; the baby could "slip out" quickly, causing head entrapment, or the labor "could progress quite slowly."

[14]Roberts, like the other two medical experts, did not testify as to the nature of the medical attention that might feasibly have been rendered at that stage of delivery, when the baby was well into the birth canal.

[15]Dr. Richard Callery testified also that he could not conclude that the baby had been alive in the birth canal.

[16]Before its discovery, the baby's body had been at least partially mangled in a trash truck, inflicting a considerable number of post mortem injuries. These post mortem injuries, according to Nields and Callery, included a laceration to the nose, laceration to the scalp, multiple fractures of the skull, amputation of the right arm at the elbow, and a fracture of the left forearm.

sarily indicative of "significant[]" aeration. Finally, Callery agreed with the manner of death listed in Nields' autopsy report as "undetermined."

In addition to the testimony of the three medical experts and the police officer who interviewed the defendant, the judge heard the testimony of Richard Belanger, a detective with the Milford police department. Belanger described in detail the 911 dispatch system utilized in Milford, and testified that three potential emergency responders were located between approximately two and four miles away from where the defendant gave birth.[17] However, Belanger was unable to say whether a call by the defendant while she was in labor on January 2, 2007, would have resulted in the arrival of those responders within any certain period of time after having been alerted. The judge also heard brief testimony from four individuals who were acquainted with the defendant to varying degrees and observed her conduct in the months and days prior to her pregnancy. See note 21, *infra*.

b. *The judge's memorandum of decision and order.* The judge considered the evidence in light of the three alternative bases upon which the Commonwealth sought to convict the defendant of involuntary manslaughter: (1) that the defendant failed to summon medical assistance "at least upon feeling the baby's foot," (2) that "she acted to pull the baby out of her body without first requesting medical assistance," and (3) that she failed to act reasonably to care for her newborn after delivery. In a thoughtful memorandum of decision and order, the judge concluded that the Commonwealth had proved its first two theories beyond a reasonable doubt, but had failed to prove the third.

In reaching his verdict, the judge credited some, but not all, of the account of the delivery given by the defendant during her nine hours of police interrogation. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 (1978) (finder of fact "may accept or

[17]Evidence was admitted at trial that the defendant had access to a cellular telephone at some point near the time of the delivery. This cellular telephone was registered in her boy friend's name. According to Detective Belanger's testimony on cross-examination, the police did not investigate where the cellular telephone was located at the time the defendant gave birth, and did not determine whether she had cellular telephone service at the location where she gave birth.

reject, in whole or in part, the testimony presented"). He found that the defendant realized that she was pregnant "[s]ometime in 2006," but did not credit that this realization came as late as October, 2006, when she said she took a pregnancy test. He found that the defendant's last menstrual period was in April and not, as she told interrogating officers, in August. The judge did not credit the defendant's statement that she believed she was having a miscarriage when she went into labor; rather, he found that, while at work on January 2, 2007, the defendant understood, "[f]rom her experience with the birth of her first son, . . . that contractions were associated with the birth of a child."

The judge found that the circumstances immediately preceding the delivery occurred just as the defendant had described: She returned home from work, her "water broke" while she sat on the toilet, and she pushed ten times, in addition to pulling on the baby's legs and abdomen, to ensure the baby's rapid delivery. The judge placed particular emphasis on the moment the defendant reached inside herself and felt a foot. In that instant, the judge found, the defendant knew from her earlier birthing class that the baby was in a breech position and "was aware that there was a substantial risk of harm to the child unless she sought professional assistance."[18] When she became aware of the risk of harm, moreover, "[t]here is no evidence that she believed that the baby was already dead[,] . . . no evidence that her life was in danger[,] [and] no credible evidence that she acted in an effort to save the life of the child or that the delivery was nearly instantaneous." The judge found that the entire birthing process took about six minutes and that it was unclear "what followed immediately after the actual birth." He therefore made "no findings as to what the defendant did or did not

---

[18]The defendant told police that, based on her prior birthing classes, she "just knew [babies] shouldn't come out like that" and that breech presentations are the primary reason for cesarean sections. This was the defendant's only statement about what she learned in the birthing class. The judge apparently inferred from this statement that the defendant had also learned from the birthing class that "a [cesarean] section is commonly done when a baby presents itself in the breech position at the time of delivery, and that a baby should not be delivered when it is in the breech position because it involves a high degree of risk to the child."

do in the moments immediately following the delivery other than a finding that she did not call out for help or phone for help" even though she had the means to do both.

As to the medical testimony, the judge concluded that the presence of the significant hemorrhaging described by Nields and Roberts demarcated the line between ante mortem and post mortem injuries, and that the ante mortem injuries "did not occur before birth and while the baby was in his mother's uterus." The judge

> "infer[red] that these prior-to-death injuries were caused by the defendant pulling at the baby boy's legs and grabbing other parts of his body with significant force in an effort to accelerate the process of delivery. I find that at least some of these injuries required the application of a significant amount of force such as pressing down hard with a person's thumb or a hard clamping down on the defendant's abdomen. I find that the baby boy in question did not die of natural causes."

Notwithstanding his finding that the baby was viable at least up to the moment of birth, the judge determined that the Commonwealth had not proved beyond a reasonable doubt precisely when the defendant learned she was pregnant, that the baby had been born alive (i.e., had a heartbeat after fully emerging from the defendant's body),[19] or that the baby would have lived if the defendant had called for help when her water broke and she first felt the baby's foot.

Turning to the legal significance of these findings, the judge ruled that the defendant's "decision to pull and grab the baby in an effort to dislodge its head and deliver the baby by using a significant amount of force to bring about the delivery constituted a wanton [or] reckless act" that supported a verdict of involuntary manslaughter. He concluded also that a conviction of involuntary manslaughter could be premised on the defendant's wanton or reckless breach of her duty to summon medical help, because

---

[19]The air in the baby's lungs, according to the judge, could not definitively be shown to have resulted from the baby's having breathed outside the womb, since it might have been "due to some other cause." The judge did not identify what that "other cause" might have been, but the only evidence to support another cause was the defendant's testimony about having administered "rescue breaths."

once she realized the baby was presenting in a breech position "she was aware that there was a substantial risk of harm to the child unless she sought professional assistance." The judge reasoned that no constitutional or statutory impediment prevented the Commonwealth from "prosecuting a woman for inflicting fatal injuries on a viable and near full term fetus during the birthing process," or prevented the court from recognizing that a "legal duty exists on the part of a pregnant woman to refrain from wanton or reckless acts committed against her own viable fetus."[20] Recognizing such a duty, he held, is consonant with the strong public policy of the Commonwealth to protect children and viable fetuses from harm, as evidenced in child welfare statutes and statutes proscribing late-term abortions except to save the mother's life. See G. L. c. 112, § 12M; 130 Code Mass. Regs. § 484.005 (1993) (late-term abortions). See also G. L. c. 265, § 13J (child abuse).

2. *Discussion.* a. *Preliminary considerations.* The recognition of a novel common-law duty is a matter that necessarily raises important legal and policy issues. See, e.g., *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 429 (1986) ("we are involved in a difficult and demanding area of the law in which

---

[20]As there can be no homicide without a victim, under the common law, an individual can only cause a death where "the victim was a live and independent person." *Commonwealth* v. *Edelin*, 371 Mass. 497, 512 (1976). In the case of newborns, the "heartbeat test" was used to determine whether the newborn was born alive and thus had an existence independent of the mother. *Id.* at 511. In *Commonwealth* v. *Cass*, 392 Mass. 799, 807 (1984), however, we departed from this common-law rule in the case of fetal injury, holding that "the better rule is that infliction of prenatal injuries resulting in the death of a viable fetus, before or after it is born, is homicide." We have defined a "viable" fetus as being a fetus "so far formed and developed that if then born it would be capable of living." *Commonwealth* v. *Crawford*, 430 Mass. 683, 689 (2000), quoting *Torigan* v. *Watertown News Co.*, 352 Mass. 446, 448 (1967). Thus, if a third party causes the death of a fetus capable of living if it were then born, he or she can be convicted of involuntary manslaughter. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 383-384 (1989).

Here, the judge found explicitly that the Commonwealth had not proved the fetus had been alive independent of the defendant, but instead found that the fetus was viable "during the birthing process and up to the point when the defendant began to pull it out." It was this viable fetus, according to the judge, that the defendant had killed. The judge's finding of viability has a firm evidentiary basis, as both of the Commonwealth's expert witnesses testified that the fetus was nearly full term, healthy, and alive in utero.

each case presents issues of fundamental importance"). In setting this matter in context, it is useful to delineate what this case is *not* about. First, this is not a murder case. The crime of which the defendant was convicted, involuntary manslaughter, is an "*unintentional,* unlawful killing caused by wanton or reckless conduct" (emphasis added). *Commonwealth* v. *Earle,* 458 Mass. 341, 347 (2010). See part 2.d, *infra.* By contrast, the gravamen of murder is malice, see *Commonwealth* v. *LaCava,* 438 Mass. 708, 717 n.9 (2003), an element that the Commonwealth, by charging the defendant with involuntary manslaughter, did not allege here. Second, this case is not about late-term abortion, which our statutes forbid except as necessary to save a mother's life. See G. L. c. 112, § 12M. To establish a late-term abortion in violation of the statute requires proof of intent — in this case, the intentional taking of a fetus's opportunity for life outside of the womb. The defendant is not charged with intending to self-abort. Third, this case is not about criminal child abuse or neglect. See G. L. c. 265, § 13J (criminalizing assault and battery on a child).

Without question, parents owe a duty to provide medical services to their independently living children, breach of which may form the basis of an involuntary manslaughter conviction. See, e.g., *Commonwealth* v. *Twitchell,* 416 Mass. 114, 118 (1993) (parents have duty to seek medical attention for child); *Commonwealth* v. *Gallison,* 383 Mass. 659, 665 (1981) (defendant convicted of involuntary manslaughter of two year old son because she "made no effort to obtain medical help, knowing that her child was gravely ill"); *Commonwealth* v. *Hall,* 322 Mass. 523, 530 (1948) (mother convicted of murder in second degree for withholding food and liquids from child). Here, however, because the judge specifically found the evidence insufficient to prove that the baby was born alive, these bases of criminal liability are inapplicable.

We are concerned instead in this case with whether the evidence was sufficient to support the conviction of involuntary manslaughter and, as part of that analysis, whether to impose on a woman in labor the duty to summon medical assistance. With these parameters drawn, we turn to consider the issues presented.

b. *Standard of review.* On review of a jury-waived trial, we

generally accept the judge's findings of fact unless they are clearly erroneous. *Cavadi* v. *DeYeso*, 458 Mass. 615, 624 (2011). See *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 670 (1989) ("the standard for appellate review of facts in both civil and criminal cases is identical"). In particular, we defer to the judge's evaluation of a witness's credibility. See *Commonwealth* v. *Peters*, 453 Mass. 818, 823 (2009). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Commonwealth* v. *Wolcott*, 77 Mass. App. Ct. 457, 471 n.12 (2010), quoting *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 792 (1986).

Where findings are predicated not on the assessment of witness credibility but, rather, on documentary materials, this highly deferential standard is inapplicable. "We have consistently held that lower court findings based on documentary evidence available to an appellate court are not entitled to deference." *Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004). Where the evidence consists of electronically recorded materials we are "in the same position as the [trial] judge." *Commonwealth* v. *Hoyt*, 461 Mass. 143, 148 (2011), quoting *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995). In addition, we review independently the judge's application of constitutional principles to the facts found. *Commonwealth* v. *Contos*, 435 Mass. 19, 32 (2001), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

c. *Factual findings.* The judge's comprehensive factual findings evidence careful consideration of the circumstances of this difficult case, and most of these findings are well supported by the defendant's videotaped statement and the other testimony.[21] The judge's unchallenged findings, however, do not suffice to establish the elements of involuntary manslaughter.

---

[21]We note, however, that the totality of the evidence considered by the judge includes a significant amount of evidence with minimal probative value but potentially high prejudicial effect. Over defense counsel's repeated objections, the judge admitted testimony from four individuals who were acquainted with the defendant to varying degrees. These individuals testified that the defendant drank and smoked in the months and days prior to her delivery, that the defendant appeared happy at a party she attended four days after the delivery, and that the defendant (while pregnant) made statements to friends

d. *Involuntary manslaughter.* "[I]nvoluntary manslaughter includes an unlawful homicide unintentionally caused by wanton and reckless conduct."[22] *Commonwealth* v. *Catalina,* 407 Mass. 779, 789 (1990). Proof of recklessness requires "more than a mistake of judgment or even gross negligence," *Commonwealth* v. *Michaud,* 389 Mass. 491, 499 (1983), and has been defined as "intentional conduct . . . involv[ing] a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky,* 316 Mass. 383, 399 (1944) (*Welansky*). Wanton or reckless conduct is determined based either on the defendant's specific knowledge or on what a reasonable person should have known in the circumstances. *Id.* at 398. If based on the objective measure of recklessness, the defendant's actions constitute "wanton or reckless conduct . . . if an ordinary normal [woman] under the same circumstances would have

and to her boy friend that the couple did not intend to have another child. This evidence also included testimony as to the defendant's financial circumstances and relationship with her boy friend at the time of the delivery, her sexual history prior to the delivery, her eligibility for health insurance, and about her not visiting doctors (except on one occasion) for any purpose after the birth of her first child.

The judge recognized that the Commonwealth's indictment rested exclusively on "[t]he circumstances of the birth and the defendant's conduct during and after the birthing process." Nevertheless, the judge admitted the above testimony for the sole purpose of establishing the defendant's alleged a priori motive for committing the charged offense.

Citing *Commonwealth* v. *Brown,* 376 Mass. 156, 164 (1978), the judge reasoned that the question of motive "is relevant and admissible to help explain the conclusions that may be reached from the evidence." Unlike *Commonwealth* v. *Brown, supra,* however, where the prosecutor offered, but the judge excluded as unduly prejudicial, evidence that the defendant was a habitual drug user to prove his motive for murder in the first degree and armed robbery — crimes requiring proof of the defendant's intent to achieve the unlawful result — the intent to achieve an unlawful result is not an element of involuntary manslaughter. See *Commonwealth* v. *Life Care Ctrs. of Am., Inc.,* 456 Mass. 826, 832 (2010), citing *Commonwealth* v. *Demboski,* 283 Mass. 315, 322 (1933) ("when we refer to the intent required to support a conviction of involuntary manslaughter, we refer to the intent to perform the act that causes death and not the intent that a death occur"); *Commonwealth* v. *Costa,* 2 Mass. App. Ct. 854, 855 (1974) (motive is irrelevant to crime of manslaughter).

[22]The judge did not apply the second standard for involuntary manslaughter, involving an unintentional killing resulting from "a battery not amounting to a felony which the defendant knew or should have known endangered human life." *Commonwealth* v. *Pierce,* 419 Mass. 28, 33 (1994).

realized the gravity of the danger." *Id.* at 398-399. If based on the subjective measure, i.e., the defendant's own knowledge, "grave danger to others must have been apparent and the defendant must have chosen to run the risk rather than alter [her] conduct so as to avoid the act or omission which caused the harm." *Id.* at 398.

As a general rule, the requirement of "wanton or reckless conduct" may be satisfied by either the commission of an intentional act or an intentional *"omission where there is a duty to act"* (emphasis added). *Id.* at 399. Both "commission" — physical acts to dislodge the fetus in breech presentation from the birth canal — and "omission" — failing to summon medical assistance — are at issue in this case. Although the judge often merged the two types of conduct in his written findings (e.g., the defendant "acted to pull the baby out of her body without first requesting emergency medical assistance"), they are conceptually distinct and form alternative bases for the Commonwealth's theory of criminal responsibility. Thus, we consider each separately.

On the question of commission, the judge concluded that, during the birthing process, the defendant acted recklessly and wantonly in disregard of a substantial risk of harm to the baby by using "a significant amount of force" to effect the delivery, including the defendant's bearing down on her stomach and reaching into herself to pull the baby out. The judge, however, did not explain how a hypothetical reasonable woman in the throes of childbirth *should* have acted in the circumstances to avoid criminal liability (other than to summon medical help, a separate issue). Yet the inquiry as to reasonable conduct is central to whether the defendant acted recklessly from an objective perspective. See *Welansky, supra* at 398-399.

What constitutes reasonable conduct during labor and childbirth defies ready articulation. Women give birth alone or with others in attendance, with or without complications, and they do so in myriad circumstances, each labor and childbirth posing its own challenges. There does not appear to be any "one size fits all" rule. The evidence does not suggest alternatives that a reasonable woman in the defendant's circumstances would have chosen that, in the judge's words, would have been substantially

less likely to "inflict[] fatal injuries on a viable and near full term fetus during the birthing process." There was no evidence as to what physical alternatives might have been available to an unattended woman in labor following the realization that the baby she was then delivering was in a breech presentation. There was no evidence as to what could have been done in those circumstances that would have constituted a safer course of conduct. There was no suggestion that one alternative was to have done nothing — no pushing, no bearing down, no efforts to dislodge the baby. Failing proof of a more reasonable (i.e., less risky) course of conduct during childbirth, the defendant's conduct during this late stage of labor cannot be deemed wanton or reckless because she cannot be said to "have chosen to run the risk rather than alter [her] conduct so as to avoid the act or omission which caused the harm." *Id.* at 398. Insofar as her acts of allegedly reckless "commission" cannot readily be distinguished from those of giving birth itself, they cannot support a conviction under the objective prong of wanton or reckless conduct amounting to involuntary manslaughter.

To the extent that the conviction of involuntary manslaughter rests on the wanton or reckless acts of commission based on the defendant's own knowledge (i.e., the subjective measure), the test is whether grave danger to the fetus must have been apparent to the defendant and whether the defendant chose to run that risk rather than alter her conduct so as to avoid the act causing the harm. *Id.* The evidence is insufficient as to both aspects of the test.

The defendant never admitted that she recognized a risk of harm to the baby that she then disregarded by using a significant amount of force to bring about the delivery. See note 18, *supra.* To support an inference that she recognized, and thereafter disregarded, the risk of harm from a breech birth, the Commonwealth relied on the fact that the defendant, eight years earlier, had attended a birthing class at which she learned that babies in a breech position "shouldn't come out like that." See *id.* When the defendant felt the foot and realized that she was delivering a baby in breech presentation, she had already embarked on an unassisted home delivery. Any knowledge of the risk of harm to herself and the baby from delivery in a

breech position did not change the physical alternatives then available to her.

There was no evidence that the defendant knew that the baby was in a breech presentation at any time before she felt the foot. By then, the baby was already in the birth canal and the childbirth process was in its final stage.[23] Whether she continued to push the baby out, began to pull on the baby from inside of her, or tried to refrain from pushing or pulling and instead to bide her time, the baby was proceeding through the birth canal, a process over which the defendant had little if any control. Delivery in these circumstances carried inherent risks for both the baby and the defendant no matter what she had learned years before about the complications of breech births. Any pre-existing knowledge as to breech births that the defendant may have had is too speculative to support the inference that the defendant understood and disregarded a risk to the baby during this unassisted delivery. See *Commonwealth* v. *Earle*, 458 Mass. 341, 347 n.9 (2010) ("relevant inquiry is whether . . . the defendant in fact knew of the danger"). Given the absence of evidence as to available alternatives, the Commonwealth did not prove that the defendant chose "to run the risk rather than alter [her] conduct." *Welansky, supra* at 398.

Furthermore, the evidence was insufficient to establish, beyond a reasonable doubt, that any act of force used by the defendant, either by pushing or pulling, caused the baby's death. All three of the medical experts testified that the source of the injuries, and the cause of death, was uncertain. Nields, the medical examiner who performed the autopsy, testified that the injuries were "peripartum injuries of uncertain etiology," occurring either before, during, or immediately after delivery. He was unable to determine which, if any, of the injuries caused the death, and testified that the cause of death was "undetermined." Roberts, the perinatal pathologist, could not determine how the injuries occurred, but testified that the "probable" cause of death was trauma, hemorrhage, suffocation, and exposure. She testified

---

[23]There was no evidence admitted at trial that a cesarean section could have been performed at this late stage in the childbirth process. See *Henry* v. *Bronx Lebanon Med. Ctr.*, 53 A.D.2d 476, 478 (N.Y. 1976) ("Because the baby was partly delivered, a [cesarean] section at this point was impossible").

also as to "head entrapment" during a breech birth, and the risks of suffocation if the baby is stuck in the cervix and the umbilical cord is compressed. Callery, the chief medical examiner of Delaware, testified that it was impossible to tell whether the injuries occurred before or after death and, like Nields, testified that the cause of death was "undetermined." None of this testimony could establish beyond a reasonable doubt (i.e., an "abiding conviction" or "moral certainty"), *Commonwealth* v. *Ferriera*, 460 Mass. 781, 787-788 (2011), that an act of commission by the defendant caused the baby's death.

Thus, a finding of involuntary manslaughter predicated on the defendant's affirmative actions during delivery, under either the objective or subjective measure of wanton or reckless conduct, is not supported by the evidence, and the conviction on these bases cannot stand. We turn now to the Commonwealth's second theory of criminality, omission where the defendant had a duty to act.

The judge's unchallenged factual findings raise issues of the sufficiency of the evidence as to the defendant's act of omission. Insofar as the judge found that "it is left to speculation and thus not proved that the baby would have lived if the defendant had called for help when her water broke and she first felt the baby's foot," the defendant's failure to summon medical assistance cannot be the legal or proximate cause of the baby's death. Proximate cause "is a cause, which, in the natural and continuous sequence, produces the death, and without which the death would not have occurred." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980), quoting California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979). "That the victim's death followed the defendant's [omission] in point of time is not sufficient proof to establish the defendant's guilt. Post hoc, non ergo propter hoc." J.R. Nolan & L.J. Sartorio, Criminal Law § 121 (3d ed. 2001). Speculation that the baby might have survived if the defendant had summoned medical help does not satisfy the Commonwealth's burden of proving causation beyond a reasonable doubt because that the baby "*might* have survived with proper care . . . engender[s] considerable doubt as to what actually happened." *State* v. *Osmus*, 73 Wyo. 183, 202 (1954).

Such speculation is particularly inadequate in this case, because there was no expert testimony as to what assistance, once

summoned, medical professionals could have rendered, or whether that assistance would have been successful. Indeed, when questioned on cross-examination, neither of the Commonwealth's experts was able to opine that the baby would have lived if the defendant had sought medical attention during the birth; one testified that it might have been "possible," but not certain, and the other stated that it would have been "likely" if medical help had been summoned when contractions began (a point well before the defendant felt the foot). Because there was insufficient evidence that any omission by the defendant caused the baby's death, the defendant cannot be convicted of involuntary manslaughter for failing to summon medical assistance.

e. *The duty to summon.* While the failure of proof on the issue of proximate cause is sufficient to decide the question of the defendant's criminal responsibility by reason of omission, we nevertheless reach the issue whether a woman in childbirth, in these circumstances, has a duty to summon medical assistance because the question is "one of public importance [and] the matter has been fully briefed and argued," *Commonwealth* v. *Washington W.*, 457 Mass. 140, 142 n.3 (2010), and because "the issue is novel in Massachusetts, and . . . similar circumstances may arise in the future." *McDonough, petitioner*, 457 Mass. 512, 522 (2010). See *Smith* v. *McDonald*, 458 Mass. 540, 543 n.4 (2010); *Andrade* v. *City Council of Gloucester*, 406 Mass. 337, 338 (1989); *Labor Relations Comm'n* v. *Selectmen of Dracut*, 374 Mass. 619, 625 (1978). Further, that such "duty to summon" cases have arisen in other jurisdictions[24] suggests the ongoing and widespread significance of the issue.

---

[24]Other courts to have considered the issue largely disfavor imposing such liability. Some courts have determined that a mother cannot be held criminally liable for homicide arising from the events of unattended childbirth on the basis that no criminal duty is owed by the pregnant woman. See, e.g., *United States* v. *Riley*, 58 M.J. 305 (C.A.A.F. 2003) (reversing involuntary manslaughter conviction on basis that defendant's conduct did not rise to level of culpable negligence, implicitly refusing to recognize duty to obtain medical assistance during childbirth); *Singleton* v. *State*, 33 Ala. App. 536 (1948) (reversing murder conviction of unattended mother where "the sum total of the evidence presented by the State as to [the] infant's death [was] that she may have been guilty of non-feasance in failing to tie the severed umbilical cord of her just delivered baby"); *Williams* v. *State*, 88 Ga. App. 761 (1953) (reversing involuntary manslaughter conviction after unattended childbirth due to absence of evidence that any act of the defendant had caused the

The defendant stated many times throughout her three police interrogations that she did not summon medical assistance before, during, or after her delivery. The judge concluded that such a failure to summon assistance constituted a breach of the defendant's "legal duty . . . to refrain from wanton or reckless acts committed against her own viable fetus," a duty we have not heretofore recognized.[25] Because such a "duty to summon" has

death); *People* v. *Weeks*, 115 Ill. App. 3d 524, 528-529 (1983) (assuming duty exists but concluding that defendant — who lost consciousness and was in pain, losing blood, and weak during childbirth — was physically incapable of performing it and thus reversing involuntary manslaughter conviction); *State* v. *Doyle*, 205 Neb. 234 (1980) (reversing involuntary manslaughter conviction following unattended birth because "[t]here was no evidence offered by the State that had the defendant done something, which she did not do, the infant would have lived"); *State* v. *Everhart*, 291 N.C. 700, 704 (1977) (reversing mother's involuntary manslaughter conviction on basis that her affirmative conduct was insufficient to sustain conviction, thereby implicitly refusing to impose criminal duty); *State* v. *Collington*, 259 S.C. 446 (1972) (affirming involuntary manslaughter conviction on ground that there was sufficient proof baby had been born alive and that mother had engaged in affirmative act to kill baby); *State* v. *Osmus*, 73 Wyo. 183 (1954) (rejecting prosecutor's argument that "not alone was it an unlawful act to fail to provide medical [or perhaps other] care for the infant to be born, but that it was also criminal negligence").

Other courts have imposed some duty of care, but only toward a newborn, independently-living child in the circumstances soon after childbirth. See, e.g., *People* v. *Chavez*, 77 Cal. App. 2d 621 (1947) (affirming manslaughter conviction of unattended mother were baby was born alive but died after mother left baby in toilet for "some seven minutes" and then "let it remain on the floor in a cold room for some fifteen minutes while she attended to other things, after which she put it in a newspaper and hid it under the tub"); *Hall* v. *State*, 243 Ga. 207 (1979) (affirming mother's murder conviction because there was sufficient evidence newborn had been born alive and was killed by action of mother); *Commonwealth* v. *Signerski*, 14 Pa. D. 361 (Ct. of Oyer & Terminer 1905) (although jury convicted father of murder in second degree, court instructed jury that father owed duty of care requiring him to obtain help for mother during childbirth, breach of which could support manslaughter conviction); *Vaughan* v. *Commonwealth*, 7 Va. App. 665 (1989) (reversing murder conviction where "record contain[ed] no evidence that [defendant] knew that a failure to cover the baby, clear his air passages, and tie the umbilical cord would cause the baby's death," defendant "was sixteen years of age, was 'psychosocially immature,' was 'shocked and upset,' and was experiencing 'a considerable amount of trauma . . . involved with the discharge of a baby,' " but permitting retrial for involuntary manslaughter).

[25] We have recognized that "[w]here one's actions create a life-threatening risk to another, there is a duty to take reasonable steps to alleviate the risk. The reckless failure to fulfil this duty can result in a charge of manslaughter." *Com-*

never been recognized in the Commonwealth, we look to guiding principles from our well-settled jurisprudence.

We begin with the bedrock principle that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of [the individual's] own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry.* v. *Botsford,* 141 U.S. 250, 251 (1891). The fundamental right of bodily integrity encompasses freedom from involuntary medical treatment. See, e.g., *Cruzan* v. *Director, Mo. Dep't of Health,* 497 U.S. 261, 278 (1990) ("a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"). This right is "deeply personal," *id.* at 281, and "arises both from the common law and the unwritten and penumbral constitutional right to privacy." *Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417, 430 (1986). "Every competent adult has a right 'to [forgo] treatment, or even cure, if it entails what for him [or her] are intolerable consequences or risks however unwise his [or her] sense of values may be in the eyes of the medical profession.' " *Harnish* v. *Children's Hosp. Med. Ctr.,* 387 Mass. 152, 154 (1982), quoting *Wilkinson* v. *Vesey,* 110 R.I. 606, 624 (1972).

We have recognized this right of bodily integrity where a pregnant woman's refusal of medical treatment could potentially harm her fetus. In *Taft* v. *Taft,* 388 Mass. 331, 332, 334 n.4 (1983), this court declined to order a woman to undergo a surgical procedure in her fourth month of pregnancy (before viability), so that "the cervix would hold" the pregnancy, because the record failed to demonstrate that the State's interest in the life of the fetus was sufficiently compelling to override the woman's objections on privacy and religious grounds to the medical procedure.

---

monwealth v. *Levesque,* 436 Mass. 443, 450 (2002). That case concerned a duty to report; the defendants were convicted of involuntary manslaughter for not reporting a fire they set by accident that resulted in the deaths of third parties. In this case, by contrast, the defendant did not "create a life-threatening risk to" her baby by going into labor. In addition, it is evident that the duty imposed by the trial judge encompasses the obligation not merely to summon medical assistance during childbirth, but also then personally to submit to medical treatment that an individual may consider invasive.

The right to refuse medical treatment, although strongly rooted in our constitutional and common law, is not absolute. "As distilled from the cases, the State has claimed interest in: (1) the preservation of life; (2) the protection of the interests of innocent third parties; (3) the prevention of suicide; and (4) maintaining the ethical integrity of the medical profession." *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 741 (1977). In certain very limited circumstances, these State interests may override a competent individual's privacy rights. *Id.* Any attempt by the State to override a competent adult's decision about her medical care, however, is carefully scrutinized. In virtually every instance where we have considered the issue, we have upheld the "right of a competent individual to refuse medical treatment," *Shine* v. *Vega,* 429 Mass. 456, 463 (1999), quoting *Norwood Hosp.* v. *Munoz,* 409 Mass. 116, 122 (1991), and the Commonwealth has not cited any cases to the contrary. Even "the State's interest in the preservation of life does not invariably control the right to refuse treatment," *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 263 (1979),[26] and individuals, including pregnant women, therefore retain their right to forgo medical treatment even in life-threatening situations. See *Shine* v. *Vega, supra* at 467.

The judge considered the first two of these interests — in protecting life and protecting the interests of third parties — as countervailing and outweighing the right of a woman in labor to refuse medical assistance during childbirth. He drew support from strong expressions of public policy favoring the protection of a viable fetus. These include G. L. c. 112, § 12M, which forbids abortion after the twenty-fourth week of pregnancy except "if it is necessary to save the life of the mother, or if a continuation of her pregnancy will impose on her a substantial risk of grave impairment of her physical or mental health"; the restrictions on the right to abortion recognized in *Roe* v. *Wade,* 410 U.S. 113, 164-165 (1973), and *Planned Parenthood of*

---

[26]In *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 263 (1979), we held that a competent individual's right to forgo treatment could be outweighed by a State interest. We said that a competent, nonconsenting, adult prisoner might be required to submit to life-saving hemodialysis, based primarily on "the State's interest in upholding orderly prison administration." *Id.* at 264.

*Southeastern Pa.* v. *Casey*, 505 U.S. 833, 878-879 (1992); and the imposition of criminal liability, in abrogation of the common law, on third-party "infliction of prenatal injuries resulting in the death of a viable fetus, before or after it is born." *Commonwealth* v. *Cass*, 392 Mass. 799, 807 (1984). These cases may serve, at least in part, to delimit both a pregnant woman's control over her reproductive choices and to proscribe a third party's actions that bring about the death of a viable fetus. They do not, however, support the imposition of a broad duty to summon medical assistance in these circumstances.

The judge noted correctly that criminal liability may be imposed on a person — whether a woman in the late stages of pregnancy, a physician, or a third party — who intentionally kills a viable fetus. But we are not presented here with a case in which a woman forgoes medical treatment during childbirth with the specific intent of ensuring the death of her viable fetus. Contrast *State* v. *Collins*, 986 S.W.2d 13, 18-19 (Tenn. Crim. App. 1998) (affirming conviction of murder in second degree on theory that defendant intentionally chose not to seek medical care during and after delivery because she did not want child). Nor are we presented with a case where a woman embarks on unassisted childbirth after having been informed that doing so will severely imperil the baby's life. Instead, we are presented with the situation of a woman undergoing unassisted childbirth who had no reason to suspect complications at its outset.[27] There is no affirmative duty in such circumstances to summon — and, implicitly, to accept — medical assistance, even where the failure to do so might result in unintentional harm to a fetus.

Requiring pregnant women in such circumstances to summon medical treatment during childbirth would also result in the effective criminalization of medically unassisted childbirth, such as unattended births or home births with a lay midwife. Although the vast majority of women elect hospital births, medically unassisted births continue to take place both by choice and by

---

[27]By the time the defendant became aware that the baby was in a breech position, there is no evidence that summoning medical help would have saved the baby. We need not in any event reach the question whether any duty might exist where there is foreknowledge that unassisted childbirth will severely imperil the baby's life.

necessity.[28] "Children are born of unattended mothers on trains, in taxis, and in other out of the way places, and we fear to open up a field for unjust prosecutions of actually innocent women." *State* v. *Osmus*, 73 Wyo. 183, 201 (1954). Unassisted childbirth has always been a legally recognized alternative to medically assisted childbirth.[29] All births, regardless of venue, carry inherent risks;[30] in the ordinary course, competent women who are pregnant may weigh these risks themselves and make decisions about the course of their own pregnancies and childbirths.

In *Remy* v. *MacDonald*, 440 Mass. 675, 683 (2004), we declined to impose on pregnant women a duty in tort to refrain from negligent conduct, concluding that "there are inherent and important differences between a fetus, in utero, and a child already born, that permit[] a bright line to be drawn around the zone of potential tort liability of one who is still biologically joined to an injured plaintiff." Maintaining that "bright line" as to the criminal liability of a woman in childbirth to "one who is still biologically joined" to her is no less necessary. Cf. *Commonwealth* v. *Levesque*, 436 Mass. 443, 449 (2002) ("When formulating duties in the criminal context, we have, in the past, drawn on the duties imposed by civil law").

Recognition of the broad and ill-defined duty to summon, and accept, medical assistance imposed by the judge in this case would amount to a significant incursion on a birthing woman's

[28]By some estimates, approximately one per cent of women in the United States forgo "physicians and hospitals, opting instead for a birth at home or a freestanding birth center." Note, Born (Not So) Free: Legal Limits on the Practice of Unassisted Childbirth or Freebirthing in the United States, 94 Minn. L. Rev. 1651, 1654 (2010) (Note). There is some evidence to indicate that home births have increased considerably in recent years. See National Center for Health Statistics Data Brief No. 84, Home Births in the United States, 1990-2009 at 1 (Jan. 2012) ("U.S. home births increased by 29% from 2004 to 2009").

[29]The Legislature has neither banned nor regulated lay midwives, who are trained in attending births but have not obtained a nursing degree, see *Leigh* v. *Board of Registration in Nursing*, 399 Mass. 558, 562 (1987) (upholding G. L. c. 112, § 80C, which regulates only nurse midwives), suggesting an intent to maintain such forms of assistance in childbirth as viable options. See *id.* ("The statute does not require women to give birth in a hospital, nor does it force women to obtain medical treatment").

[30]"Homebirths attended by a midwife are statistically shown to be as safe, if not safer, than hospital births for most low-risk women . . . ." Note, *supra* at 1670.

liberty interest in freedom from an unwarranted degree of government surveillance and coercion. The duty to summon medical assistance imposed in this case implicitly carries with it the duty for a woman to accept medical intervention, including potentially risky surgical procedures such as a cesarean section, if necessary to advance fetal survival. Such a duty would create an undesirable adversity of interests between the pregnant woman and the fetus in utero.[31,32] See *Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 687 (1977) ("the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State"); *Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"). Going into labor is

---

[31]Creating a criminal law duty on the part of a pregnant or birthing woman to her fetus "would require doctors to become agents of the criminal justice apparatus, monitoring maternal/fetal relations and reporting disobedient patients." Note, Maternal Rights and Fetal Wrongs: The Case Against the Criminalization of "Fetal Abuse," 101 Harv. L. Rev. 994, 1011 (1988). Such a regime may provide adverse incentives for a woman to be less than fully honest with her doctor for fear that any deviation from a doctor's advice may make her criminally culpable. *Id.* Therefore, rather than encouraging more women to see doctors during pregnancy and childbirth, such a duty may instead "harm more fetuses than it helps." *Id.*

Nothing in our holding today should be read to disturb the strong public policy of this Commonwealth promoting the birth of healthy babies. See G. L. c. 119, § 1 ("It is hereby declared to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the care and protection of children"). See generally *Stallman* v. *Youngquist*, 125 Ill. 2d 267, 280 (1988) ("The way to effectuate the birth of healthy babies is not, however, through after-the-fact [criminal] liability[] for individual mothers, but rather through before-the-fact education of all women and families about prenatal development").

[32]In certain cases, the imposition of such a duty to summon and accept medical assistance will also implicate a woman's right to free exercise of religion. See, e.g., *Taft* v. *Taft*, 388 Mass. 331, 334 (1983) (refusing to override woman's treatment decision on basis of her "constitutional right to privacy" and "religious belief that the operation should not or need not be performed"). While the defendant does not assert such an interest here, other cases could raise this additional constitutional concern. See, e.g., *In re Brown*, 294 Ill. App. 3d 159, 171 (1997) (holding that mother could not be compelled to undergo blood transfusions for the benefit of her viable fetus in light of her beliefs as a Jehovah's Witness).

not itself a life-threatening risk to the unborn baby that always requires medical assistance. Based on the usual risks of childbirth, the decision to proceed with an unassisted home birth cannot by itself permit a finding of wanton or reckless conduct necessary to establish involuntary manslaughter when the baby unintentionally dies in childbirth.[33]

Moreover, the duty imposed by the judge raises issues of due process, for such a duty would be impossible to cabin and would be highly susceptible to selective application. See *Commonwealth v. Quinn,* 439 Mass. 492, 499 (2003). Pregnancy presents a unique circumstance because "anything which a pregnant woman does or does not do may have an impact, either positive or negative, on her developing fetus." *Stallman* v. *Youngquist,* 125 Ill. 2d 267, 276 (1988). As a consequence, every decision a woman makes during her pregnancy, medical or otherwise, could have a profound impact on the fetal life inside her. Drawing the line between what is lawful and what is criminal conduct on the part of pregnant women and women in labor would be left to individual law enforcement officials and judges. Given the socially freighted nature of questions surrounding a pregnant woman's relationship to her fetus, it is not difficult to foresee a patchwork of unpredictable and conflicting prosecutorial and judicial actions resulting from the newly created duty to summon medical assistance at issue here.

In refusing to impose a tort duty of care on a woman to refrain from negligent conduct during her pregnancy in *Remy* v. *MacDonald, supra,* we based our decision, in part, on the difficulty of defining the scope of liability that such a duty would create.

> "Recognizing a pregnant woman's legal duty of care in negligence to her unborn child would present an almost unlimited number of circumstances that would likely give rise to litigation. Courts would be challenged to refine the scope of such a duty, including the degree of knowledge expected of a mother in order to pinpoint when such a

---

[33]Nothing we have said should be seen as foreclosing the possibility that, in some future case, recognition of a defined and limited duty might be appropriate. We simply decline to impose on all women the categorical duty advanced in this case and applied in these circumstances.

duty would arise (e.g., at the point of pregnancy; at the point of awareness of pregnancy; or at the point of awareness that pregnancy is a possibility) or the particular standard of conduct to which a reasonably careful pregnant woman, in a single case, should be held."

*Id.* at 678.

That is also the problem here. Indeed, neither the judge nor the Commonwealth delimited the duty to summon medical help, either temporally, in relation to the kind and degree of difficulty during childbirth, the advance knowledge of significant risks to the fetus posed by unassisted labor, or on any other criteria. If the duty is premised on the likelihood of harm to viable fetuses inherent in all pregnancies, any such duty is not only unduly broad, it also could readily be expanded to encompass not just the time of childbirth, but the latter stages of pregnancy as well. Given the countless ways in which a woman can be perceived to endanger her fetus during pregnancy or childbirth, see *id.* at 677-678, recognition of a duty as formulated here risks criminalizing constitutionally protected conduct. See *Commonwealth v. Welch*, 864 S.W.2d 280, 283 (Ky. 1993), quoting *Commonwealth v. Kemp*, 18 Pa. D. & C. 4th 53, 63 (1992) (imposition of criminal liability for fetal abuse "might lead to a 'slippery slope' whereby the law could be construed as covering the full range of a pregnant woman's behavior — a plainly unconstitutional result"). "A pregnant woman may place her fetus in danger by engaging in activities involving a risk of physical harm or by engaging in activities, such as most sports, that are generally not considered to be perilous. A pregnant woman may jeopardize the health of her fetus by taking medication (prescription or over-the-counter) or, in other cases, by not taking medication." *Remy v. MacDonald, supra* at 678. The duty to summon medical assistance as imposed by the judge in this case is thus inchoate, creating impermissible uncertainty as to just what conduct is and is not included within its purview. See *Commonwealth v. Quinn, supra.* Because the scope of the duty the Commonwealth would have us establish cannot be logically confined, we decline to impose it.

Finally, "[p]regnancy does not come only to those women who have within their means all that is necessary to effectuate the best

possible prenatal environment." *Stallman* v. *Youngquist, supra* at 279. Women in all circumstances give birth: "the well-educated and the ignorant; the rich and the poor; those women who have access to good health care and good prenatal care and those who, for an infinite number of reasons, have not had access to any health care services." *Id.* We are not free to ignore that the imposition of criminal liability on a woman in labor for breach of the duty at issue here is likely to have the greatest impact on the most vulnerable groups of pregnant women — young teens, victims of rape and incest, the undocumented, residents of remote areas — who may have no realistic alternatives than to give birth unassisted. The Commonwealth asks us to impose a duty that all women cannot reasonably be expected to bear. We decline to do so.

3. *Conclusion.* We conclude by reiterating that this is not a case of intentional homicide. Where there is evidence that a pregnant woman acts with the requisite malice in killing a viable fetus during childbirth, she may be charged under existing criminal laws that punish intentional behavior. Here, however, the defendant was charged with the unintentional death of her viable fetus. The evidence does not support her conviction of involuntary manslaughter, predicated in part on an ill-defined duty raising grave constitutional concerns. For the reasons explained, the conviction must be reversed.

> *Judgment reversed.*
>
> *Finding set aside.*
>
> *Judgment for the defendant.*