KAFKER, J.
**353 At age seventeen, Michelle Carter was charged with involuntary manslaughter as a youthful offender for the suicide death of Conrad Roy, age eighteen. In Commonwealth v. Carter, 474 Mass. 624, 52 N.E.3d 1054 (2016) ( Carter I ), we affirmed the Juvenile Court judge's denial of the motion to dismiss the youthful offender indictment, "conclud[ing] that there was probable cause to show that the coercive quality *562 of the defendant's verbal conduct overwhelmed whatever willpower the eighteen year old victim had to cope with his depression, and that but for the defendant's admonishments, pressure, and instructions, the victim would not have gotten back into [his] truck and poisoned himself to death." Id. at 635-636, 52 N.E.3d 1054. Thereafter, the defendant waived her right to a jury trial, and the case was tried to a judge in the Juvenile Court over several days. The defendant was convicted as charged and has **354 appealed. We now consider whether the evidence at trial was sufficient to support the judge's finding of proof beyond a reasonable doubt that the defendant committed involuntary manslaughter as a youthful offender, and whether the other legal issues raised or revisited by the defense, including that the defendant's verbal conduct was protected by the First Amendment to the United States Constitution, require reversal of the conviction. We conclude that the evidence was sufficient to support the judge's finding of proof beyond a reasonable doubt that the defendant committed involuntary manslaughter as a youthful offender, and that the other legal issues presented by the defendant, including her First Amendment claim, lack merit. We therefore affirm.[1]
Facts. In Carter I, 474 Mass. at 625-630 & nn.3-8, 52 N.E.3d 1054, we discussed at length the facts before the grand jury, including the numerous text messages exchanged between the defendant and the victim in the days leading up the victim's death on July 12, 2014. Viewed in the light most favorable to the Commonwealth, Commonwealth v. Latimore, 378 Mass. 671, 676-677, 393 N.E.2d 370 (1979), the evidence supporting the defendant's conviction was not substantially different at trial and revealed the following facts.
On July 13, 2014, the victim's body was found in his truck, which was parked in a store parking lot in Fairhaven. He had committed suicide by inhaling carbon monoxide that was produced by a gasoline powered water pump located in the truck.
The defendant, who lived in Plainville, and the victim, who divided his time between his mother's home in Fairhaven and his father's home in Mattapoisett, first met in 2012, when they were both visiting relatives in Florida. Thereafter, they rarely saw each other in person, but they maintained a long-distance relationship by electronic text messaging[2] and cellular telephone (cell phone) conversations. A frequent subject of their communications was the victim's fragile mental health, including his suicidal thoughts. Between October 2012 and July 2014, the victim attempted suicide several times by various means, including overdosing on over-the-counter medication, drowning, water poisoning, and suffocation. None of these attempts succeeded, as the victim abandoned each attempt or sought rescue.
**355 At first, the defendant urged the victim to seek professional help for his mental illness. Indeed, in early June 2014, the defendant, who was planning to go to McLean Hospital for treatment of an eating disorder, asked the victim to join her, saying that the professionals there could help him with his depression and that they *563 could mutually support each other. The victim rebuffed these efforts, and the tenor of their communications changed. As the victim continued researching suicide methods and sharing his findings with the defendant, the defendant helped plan how, where, and when he would do so,[3] and downplayed his fears about how his suicide would affect his family.[4] She also repeatedly chastised **356 him for his indecision and delay, texting, for example, that he "better not be bull shiting me and saying you're gonna do this and then purposely get caught" and made him "promise" to kill himself.[5] The trial judge found that the *564 defendant's actions from **357 June 30 to July 12 constituted wanton or reckless conduct in serious disregard of the victim's well-being, but that this behavior did not cause his death. This and other evidence, however, informed and instructed the judge about the nature of their relationship and the defendant's understanding of "the feelings that he has exchanged with her -- his ambiguities, his fears, his concerns," on the next night.
In the days leading to July 12, 2014, the victim continued planning his suicide, including by securing a water pump that he would use to generate carbon monoxide in his closed truck.[6] On July 12, the victim drove his truck to a local store's parking *565 lot **358 and started the pump. While the pump was operating, filling the truck with carbon monoxide, the defendant and victim were in contact by cell phone. Cell phone records showed that one call of over forty minutes had been placed by the victim to the defendant, and a second call of similar length by the defendant to the victim, during the time when police believe the victim was in his truck committing suicide. There is no contemporaneous record of what the defendant and victim said to each other during those calls.
The defendant, however, sent a text to a friend at 8:02 P.M. , shortly after the second call: "he just called me and there was a loud noise like a motor and I heard moaning like someone was in pain, and he wouldn't answer when I said his name. I stayed on the phone for like 20 minutes and that's all I heard." And at 8:25 P.M. , she again texted that friend: "I think he just killed himself." She sent a similar text to another friend at 9:24 P.M. : "He called me, and I heard like muffled sounds and some type of motor running, and it was like that for 20 minutes, and he wouldn't answer. I think he killed himself." Weeks later, on September 15, 2014, she texted the first friend again, saying in part:
"I failed [the victim] I wasn't supposed to let that happen and now I'm realizing I failed him. [H]is death is my fault like honestly I could have stopped him I was on the phone with him and he got out of the car because it was working and he got scared and I fucking told him to get back in ... because I knew he would do it all over again the next day and I couldn't have him live the way he was living anymore I couldn't do it I wouldn't let him."
The judge found that the victim got out of the truck, seeking fresh air, in a way similar to how he had abandoned his prior **359 suicide attempts. The judge also focused his verdict, as we predicted in Carter I, supra at 634, 52 N.E.3d 1054, on "those final moments, when the victim had gotten out of his truck, expressing doubts about killing himself." The judge found that when the defendant realized he had gotten out of the truck, she instructed him to get back in, knowing that it had become a toxic environment and knowing the victim's fears, doubts, and fragile mental state. The victim followed that instruction. Thereafter, the defendant, knowing the victim was inside the truck and that the water pump was operating -- the judge noted that she could hear the sound of the pump and the victim's coughing -- took no steps to save him. She did not call emergency personnel, contact the victim's family,[7] or instruct him to get out of the truck. The victim remained in the truck and succumbed to the carbon monoxide. The judge concluded that the defendant's actions and her failure to act constituted, "each and all," wanton and reckless conduct that caused the victim's death.
Discussion. In Carter I, we considered whether there was probable cause for the grand jury to indict the defendant as a youthful offender for involuntary manslaughter, whereas here, we consider whether the evidence at trial was sufficient to support her conviction of that offense beyond a reasonable doubt, a much higher standard for the Commonwealth to meet. In Carter I, however, we also addressed and resolved several legal principles that govern this case. We rejected the defendant's claim that her words to the victim, *566 without any physical act on her part and even without her physical presence at the scene, could not constitute wanton or reckless conduct sufficient to support a charge of manslaughter. Carter I, 474 Mass. at 632-633, 52 N.E.3d 1054. Rather, we determined that verbal conduct in appropriate circumstances could "overcome a person's willpower to live, and therefore ... be the cause of a suicide." Id. at 633, 52 N.E.3d 1054. We also ruled that "there was ample evidence to establish probable cause that the defendant's conduct was wanton or reckless under either a subjective or objective standard." Id. at 635, 52 N.E.3d 1054. See id. at 631, 52 N.E.3d 1054, quoting Commonwealth v. Pugh, 462 Mass. 482, 496-497, 969 N.E.2d 672 (2012) (wanton or reckless conduct may be "determined based either on the defendant's specific knowledge or on what a reasonable person should **360 have known in the circumstances"). As we explained, "an ordinary person under the circumstances would have realized the gravity of the danger posed by telling the victim, who was mentally fragile, predisposed to suicidal inclinations, and in the process of killing himself, to get back in a truck filling with carbon monoxide." Carter I, supra at 635, 52 N.E.3d 1054. We further explained that "the defendant -- the victim's girl friend, with whom he was in constant and perpetual contact -- on a subjective basis knew that she had some control over his actions." Id. We also rejected the defendant's claims that the involuntary manslaughter statute, G. L. c. 265, § 13, was unconstitutionally vague as applied to her, Carter I, supra at 631 n.11, 52 N.E.3d 1054 ; that her reckless or wanton speech having a direct, causal link to the specific victim's suicide was protected under the First Amendment or art. 16 of the Massachusetts Declaration of Rights, Carter I, supra at 636 n.17, 52 N.E.3d 1054 ; and that her offense did not involve the infliction or threat of serious bodily harm, as required by G. L. c. 119, § 54, the youthful offender statute, Carter I, supra at 637 n.19, 52 N.E.3d 1054. For the most part, we decline to revisit these legal issues today, as we discern no error in our earlier analysis. With these principles in mind, we turn to the defendant's arguments on appeal, providing further explication, particularly on the First Amendment claim, where we deem necessary or appropriate.
a. Sufficiency of the evidence. The defendant argues that her conviction was unsupported by sufficient evidence.[8] In particular, she argues that, to the extent her conviction was based on the victim's getting out of the truck and her ordering him back into it, it was improperly based on her after-the-fact statement, in her text message to a friend, that the victim "got out of the [truck] because it was working and he got scared and I fucking told him to get back in," a statement she asserts is uncorroborated. It is true that a conviction cannot be based solely on the defendant's extrajudicial **361 confession. Commonwealth v. Forde, 392 Mass. 453, 458, 466 N.E.2d 510 (1984). The *567 defendant's statement, however, was not uncorroborated. "The corroboration rule requires only that there be some evidence, besides the confession, that the criminal act was committed by someone, that is, that the crime was real and not imaginary." Id. Indeed, "in a homicide case, the corroborating evidence need only tend to show that the alleged victim is dead." Id.
Here, the defendant's statement was more than adequately corroborated not only by the victim's death but also by text messages exchanged with the victim encouraging him to commit suicide, and by the fact that the defendant and the victim were in voice contact while the suicide was in progress -- that is, despite the physical distance between them, the defendant was able to communicate with the victim, hear what was going on in the truck, and give him instructions. The trial judge also expressly "looked for independent corroboration of some of the statements that [the defendant] made, to make sure that there was no undue reliance on any one source of evidence." The judge emphasized that the "photos taken at the scene of the crime, where [the victim's] truck was located, clearly illustrate the location of the water pump immediately adjacent to where he would have been sitting in the truck, next to his upper torso and his head, thereby giving a good explanation to [the defendant's description] that the noise was loud within the truck. [The defendant] at that point, therefore, had reason to know that [the victim] had followed her instruction and had placed himself in the toxic environment of that truck." Clearly, the defendant was not "confessing" to an imaginary crime. In sum, the judge was entitled to credit the defendant's statement, and the corroborating details, that the victim had in fact gotten out of the truck and that the defendant ordered him back into the truck, ultimately causing his death.
The defendant also argues that the judge did not properly apply the legal principles set forth in Carter I. She points out that the judge's remarks on the record, explaining the guilty verdict, contain no express finding that her words had a "coercive quality" that caused the victim to follow through with his suicide. See Carter I, 474 Mass. at 634, 52 N.E.3d 1054. However, those remarks were, as the judge stated, not intended as a comprehensive statement of all the facts he found or of all his legal rulings. Moreover, "judges in jury-waived trials are presumed to know and correctly apply the law." Commonwealth v. Healy, 452 Mass. 510, 514, 895 N.E.2d 752 (2008), quoting **362 Commonwealth v. Watkins, 63 Mass. App. Ct. 69, 75, 823 N.E.2d 404 (2005). Finally, and perhaps most importantly, rather than use our formulation, the judge expressly tracked the elements of manslaughter. He found: "She instructs [the victim] to get back into the truck, well knowing of all of the feelings that he has exchanged with her -- his ambiguities, his fears, his concerns." This, the judge found, constituted "wanton and reckless conduct by [the defendant], creating a situation where there is a high degree of likelihood that substantial harm would result to [the victim]."[9] The judge *568 then further found that this conduct caused the victim's death beyond a reasonable doubt. His finding of causation in this context, at that precise moment in time, includes the concept of coercion, in the sense of overpowering the victim's will.
This finding is supported by the temporal distinctions about causation drawn by the judge. Until the victim got out of the truck, the judge described the victim as the cause of his own suicidal actions and reactions. This period of "self-causation" and "self-help," which is completely consistent with his prior behavior, ended when he got out of the truck. As the judge explained:
"It is apparent to this Court in reviewing the evidence that [the victim] was struggling with his issues and seeing a way to address them and took significant actions of his own toward that end. His research was extensive. He spoke of it continually. He secured the generator. He secured the water pump. He researched how to fix the generator. He located his vehicle in an unnoticeable area and commenced his attempt by starting the pump.
"However, he breaks that chain of self-causation by exiting the vehicle. He takes himself out of the toxic environment that it has become. This is completely consistent with his earlier **363 attempts at suicide. In October of 2012, when he attempted to drown himself, he literally sought air. When he exited the truck, he literally sought fresh air. And he told a parent of that attempt.
"Several weeks later, in October of 2012 again, he attempts, through the use of pills, to take his life but calls a friend and assistance is sought and treatment secured. That [the victim] may have tried and maybe succeeded another time, after July 12 or 13 of 2014, is of no consequence to this Court's deliberations." (Emphasis added.)
Once the victim left the truck, the judge found that the defendant overpowered the victim's will and thus caused his death. As the defendant herself explained, and we repeat due to its importance, "[The victim's] death is my fault like honestly I could have stopped him I was on the phone with him and he got out of the [truck] because it was working and he got scared and I fucking told him to get back in ... because I knew he would do it all over again the next day and I couldnt have him live the way he was living anymore I couldnt do it I wouldnt let him."
Although we recognize that legal causation in the context of suicide is an incredibly complex inquiry, we conclude that there was sufficient evidence to support a finding of proof of such causation beyond a reasonable doubt in the instant case. The judge could have properly found, based on this evidence, that the vulnerable, confused, mentally ill, eighteen year old victim had managed to save himself once again in the midst of his latest suicide attempt, removing himself from the truck as it filled with carbon monoxide. But then in this weakened state he was badgered back into the gas-infused truck by the defendant, his girlfriend and closest, if not only, confidant in this suicidal planning, the person who had been constantly pressuring him to complete their often discussed plan, fulfill his promise to her, and finally commit suicide. And then after she convinced him to get back into the carbon monoxide filled truck, she did absolutely nothing to help him: she did not call for help or tell him to *569 get out of the truck as she listened to him choke and die.
In sum, the evidence at trial, in the light most favorable to the Commonwealth, was sufficient to establish the defendant's guilt beyond a reasonable doubt.
b. Due process claims. The defendant argues that she lacked fair notice that she could be convicted of involuntary manslaughter **364 for her role in the victim's suicide[10] and that her conviction therefore violated her right to due process. That is, she argues that the law of involuntary manslaughter is unconstitutionally vague as applied to her conduct. We rejected this argument in Carter I, 474 Mass. at 631 n.11, 52 N.E.3d 1054, and we remain of the view that the law is not vague. "A statute is unconstitutionally vague if [people] of common intelligence must necessarily guess at its meaning.... If a statute has been clarified by judicial explanation, however, it will withstand a challenge on grounds of unconstitutional vagueness." Id., quoting Commonwealth v. Crawford, 430 Mass. 683, 689, 722 N.E.2d 960 (2000). "Manslaughter is a common-law crime that has not been codified by statute in Massachusetts." Carter I, supra, quoting Commonwealth v. Rodriquez, 461 Mass. 100, 106, 958 N.E.2d 518 (2011). It has long been established in our common law that wanton or reckless conduct that causes a person's death constitutes involuntary manslaughter. See, e.g, Commonwealth v. Campbell, 352 Mass. 387, 397, 226 N.E.2d 211 (1967), and cases cited ("Involuntary manslaughter is an unlawful homicide, unintentionally caused ... by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct"). There is no doubt in this case that the defendant wantonly or recklessly instructed the victim to kill himself, and that her instructions caused his death.
Moreover, in the development of our common law, "conduct similar to that of the defendant has been deemed unlawful." Carter I, 474 Mass. at 631 n.11, 52 N.E.3d 1054, citing Persampieri v. Commonwealth, 343 Mass. 19, 22-23, 175 N.E.2d 387 (1961). In Persampieri, supra, the defendant was charged with murder, and pleaded guilty to manslaughter, after his wife threatened to commit suicide and he taunted her, saying she was "chicken -- and wouldn't do it," loaded a rifle and handed it to her, and, when she had difficulty firing the rifle, told her to take off her shoes and reach the trigger that way. She did so and killed herself. Id. at 23, 175 N.E.2d 387. We held that these facts would "have warranted a jury in returning a verdict of manslaughter." Id. Nor is Persampieri the only case in which we upheld a defendant's conviction based on his participation in a suicide. See Commonwealth v. Atencio, 345 Mass. 627, 627-628, 189 N.E.2d 223 (1963) (affirming conviction of involuntary manslaughter arising **365 from game of "Russian roulette"). Indeed, the principle that a defendant might be charged and convicted of a homicide offense merely for "repeatedly and frequently advis[ing] and urg[ing] [a victim] to destroy himself," with no physical assistance, can be found in centuries-old Massachusetts common law. Commonwealth v. Bowen, 13 Mass. 356, 356 (1816). In the Bowen case, the defendant was in the adjoining jail cell of the victim, whom the defendant harangued into hanging himself. *570 [11] Id. It is true, as the defendant points out, that the defendant in Bowen, who was charged with murder for such alleged conduct, was in fact acquitted by the jury. Id. at 360-361. But the legal principle that procuring a suicide "by advice or otherwise" may constitute a homicide is clear from the instructions reported in Bowen. Id. at 359. In sum, our common law provides sufficient notice that a person might be charged with involuntary manslaughter for reckless or wanton conduct, including verbal conduct, causing a victim to commit suicide. The law is not unconstitutionally vague as applied to the defendant's conduct.[12]
c. Free speech claims. The defendant argues that her conviction of involuntary manslaughter violated her right to free speech under the First Amendment and art. 16.[13] We disagree and thus reaffirm our conclusion in Carter I that no constitutional violation results from convicting a defendant of involuntary manslaughter for reckless and wanton, pressuring text messages and phone calls, preying upon well-known weaknesses, fears, anxieties and promises, that finally overcame the willpower to live of a mentally ill, vulnerable, young person, thereby coercing him to commit suicide. Carter I, 474 Mass. at 636 n.17, 52 N.E.3d 1054. We more fully explain our reasoning here.
**366 The crime of involuntary manslaughter proscribes reckless or wanton conduct causing the death of another. The statute makes no reference to restricting or regulating speech, let alone speech of a particular content or viewpoint: the crime is "directed at a course of conduct, rather than speech, and the conduct it proscribes is not necessarily associated with speech" (quotation and citation omitted). Commonwealth v. Johnson, 470 Mass. 300, 308, 21 N.E.3d 937 (2014). The defendant cannot escape liability just because she happened to use "words to carry out [her] illegal [act]." Id. at 309, 21 N.E.3d 937, quoting United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982). See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949) (upholding conviction for speech used as "essential and inseparable part" of crime).
Although numerous crimes can be committed verbally, they are "intuitively and correctly" understood not to raise First Amendment concerns. Schauer, Categories and the First Amendment: A Play in Three Acts, 34 Vand. L. Rev. 265, 279 (1981). See K. Greenawalt, Speech, Crime, and the Uses of Language 6-7 (1989) (listing twenty-one examples of crimes committed using speech). The same is true under art. 16. See, e.g., Commonwealth v. Disler, 451 Mass. 216, 222, 224-226, 884 N.E.2d 500 (2008) (defendant could not assert art. 16 defense to conviction of child enticement even though crime could be committed by "words [spoken or written]
*571 and nothing more"); Commonwealth v. Sholley, 432 Mass. 721, 727, 739 N.E.2d 236 (2000), cert. denied, 532 U.S. 980, 121 S.Ct. 1621, 149 L.Ed.2d 484 (2001) ("no violation" of art. 16 where defendant was convicted of making threat under G. L. c. 275, § 2 ). "It has never been deemed an abridgment of freedom of speech ... to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed" (citation omitted). Johnson, 470 Mass. at 309, 21 N.E.3d 937.[14] Indeed, the United States Supreme Court has held that "speech or writing used as an integral part of conduct in violation of a valid criminal statute" is not protected by the First Amendment. Giboney, 336 U.S. at 498, 69 S.Ct. 684. Accord **367 United States v. Stevens, 559 U.S. 460, 468-469, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). See Commonwealth v. Chou, 433 Mass. 229, 236, 741 N.E.2d 17 (2001) ("true threats" lack First Amendment protection because "purpose is to cause injury rather than to add to, or to comment on, the public discourse").
The defendant contends nonetheless that prosecuting and convicting her of involuntary manslaughter for encouraging suicide effected a content-based restriction on speech that does not withstand strict scrutiny. In particular, she acknowledges the Commonwealth's compelling interest in preserving human life but argues that we failed to determine in Carter I, 474 Mass. at 636 n.17, 52 N.E.3d 1054, that the restriction on speech was narrowly tailored to further that interest. We disagree. The only speech made punishable in Carter I was "speech integral to [a course of] criminal conduct," Stevens, 559 U.S. at 468, 130 S.Ct. 1577, citing Giboney, 336 U.S. at 498, 69 S.Ct. 684, that is, a "systematic campaign of coercion on which the virtually present defendant embarked -- captured and preserved through her text messages -- that targeted the equivocating young victim's insecurities and acted to subvert his willpower in favor of her own," Carter I, supra at 636, 52 N.E.3d 1054. Other involuntary manslaughter prosecutions and convictions have similarly targeted a course of criminal conduct undertaken through manipulative wanton or reckless speech directed at overpowering the will to live of vulnerable victims. See Persampieri, 343 Mass. at 22-23, 175 N.E.2d 387 ; Bowen, 13 Mass. at 359-360.
As the Supreme Court has explained, "From 1791 to the present ... the First Amendment has permitted restrictions upon the content of speech in a few limited areas ... which have never been thought to raise any constitutional problems," including "speech integral to criminal conduct" (quotations and citations omitted). Stevens, 559 U.S. at 468-469, 130 S.Ct. 1577. We do not apply the narrow tailoring required by strict scrutiny in these contexts but rather determine whether the speech at issue falls within these "well-defined and narrowly limited classes of speech" (quotation and citation omitted). Brown v. Entertainment Merchants Ass'n, 564 U.S. 786, 804, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). Thus, there is nothing in the prosecution or conviction of the defendant in the instant case, or the prior involuntary manslaughter cases in the Commonwealth involving verbal criminal *572 conduct, to suggest that the First Amendment has been violated in any way. The only verbal conduct punished as involuntary manslaughter has been the wanton or reckless pressuring of a vulnerable person to commit suicide, overpowering that person's will to live and resulting in that person's death. We **368 are therefore not punishing words alone, as the defendant claims, but reckless or wanton words causing death. The speech at issue is thus integral to a course of criminal conduct and thus does not raise any constitutional problem.
Regardless, even if we were to apply strict scrutiny to the verbal conduct at issue because it might implicate other constitutionally protected speech regarding suicide or the end of life, we would conclude that the restriction on speech here has been narrowly circumscribed to serve a compelling purpose. As we explained in Carter I, 474 Mass. at 636, 52 N.E.3d 1054, and reemphasize today, this case does not involve the prosecution of end-of-life discussions between a doctor, family member, or friend and a mature, terminally ill adult confronting the difficult personal choices that must be made when faced with the certain physical and mental suffering brought upon by impending death.[15] Nor does it involve prosecutions of general discussions about euthanasia or suicide targeting the ideas themselves. See Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Nothing in Carter I, our decision today, or our earlier involuntary manslaughter cases involving verbal conduct suggests that involuntary manslaughter prosecutions could be brought in these very different contexts without raising important First Amendment concerns. See Commonwealth v. Bigelow, 475 Mass. 554, 562, 59 N.E.3d 1105 (2016) ("In considering the First Amendment's protective reach, critical to the examination is the context and content of the speech at issue" [quotation omitted] ). We emphasize again, however, that the verbal conduct targeted here and in our past involuntary manslaughter cases is different in kind and not degree, and raises no such concerns. Only the wanton or reckless pressuring of a person to commit suicide that overpowers that person's will to live has been proscribed. This restriction is necessary to further **369 the Commonwealth's compelling interest in preserving life. Thus, such a prohibition would survive even strict scrutiny.
d. "Infliction" of serious bodily harm. The defendant argues that her conviction as a youthful offender cannot survive under G. L. c. 119, § 54, because she did not inflict serious bodily harm on the victim. She argues that the term "infliction" in § 54 requires direct, physical causation of harm, not mere proximate causation, and that from her remote location, she could not have inflicted serious bodily harm on the victim within the meaning of *573 the statute. We reject this unduly narrow interpretation of the statutory language. The youthful offender statute authorizes an indictment against a juvenile who is "alleged to have committed an offense ... involv[ing] the infliction or threat of serious bodily harm" (emphasis added). G. L. c. 119, § 54. By its terms, the statute requires that the offense involve the infliction of serious bodily harm, not that the defendant herself be the one who directly inflicted it. If we were to interpret the statute to include such a requirement, it is difficult to see how a juvenile could be indicted as a youthful offender for, say, hiring a third party to carry out an attack on a victim. It is enough, as we said in Carter I, that "involuntary manslaughter in these circumstances inherently involves the infliction of serious bodily harm." Carter I, 474 Mass. at 637 n.19, 52 N.E.3d 1054.
e. "Reasonable juvenile." The defendant next argues, as she did in Carter I, that her actions should have been evaluated under a "reasonable juvenile" standard rather than a "reasonable person" standard.[16] As we said before,
"Whether conduct is wanton or reckless is 'determined based either on the defendant's specific knowledge or on what a reasonable person should have known in the circumstances.... If based on the objective measure of recklessness, the defendant's actions constitute wanton or reckless conduct ... if an **370 ordinary normal [person] under the same circumstances would have realized the gravity of the danger. ... If based on the subjective measure, i.e., the defendant's own knowledge, grave danger to others must have been apparent and the defendant must have chosen to run the risk rather than alter [his or her] conduct so as to avoid the act or omission which caused the harm' (quotations and citation omitted)."
Carter I, 474 Mass. at 631, 52 N.E.3d 1054, quoting Pugh, 462 Mass. at 496-497, 969 N.E.2d 672. The defendant argues essentially that, when considering a juvenile's actions under the objective measure of recklessness, we should consider whether an ordinary juvenile under the same circumstances would have realized the gravity of the danger. It is clear from the judge's findings, however, that he found the defendant's actions wanton or reckless under the subjective measure, that is, based on her own knowledge of the danger to the victim and on her choice to run the risk that he would comply with her instruction to get back into the truck. That finding is amply supported by the trial record. Because the defendant's conduct was wanton or reckless when evaluated under the subjective standard, there is no need to decide whether a different objective standard should apply to juveniles.
Moreover, it is clear from the judge's sentencing memorandum that he did in fact consider the defendant's age and maturity when evaluating her actions and that he was familiar with the relevant case law and "mindful" of the general principles regarding juvenile brain development. He *574 noted that on the day of the victim's death, she was seventeen years and eleven months of age and at an age-appropriate level of maturity. Her ongoing contact with the victim in the days leading to his suicide, texting with him about suicide methods and his plans and demanding that he carry out his plan rather than continue to delay, as well as the lengthy cell phone conversations on the night itself, showed that her actions were not spontaneous or impulsive. And, as the judge specifically found, "[h]er age or level of maturity does not explain away her knowledge of the effects of her telling [the victim] to enter and remain in that toxic environment, leading to his death." Where the judge found that the defendant ordered the victim back into the truck knowing the danger of doing so, he properly found that her actions were wanton or reckless, giving sufficient consideration to her age and maturity.
f. Expert witness. Finally, the defendant argues that the judge wrongly denied her motion in limine to admit expert testimony by **371 a forensic psychologist. The witness would have testified as to general principles and characteristics of the undeveloped adolescent brain, but not as to the defendant specifically, as he had never examined her. It is true, as the defendant argues, that we have upheld the admission of similar testimony in the past. See Commonwealth v. Okoro, 471 Mass. 51, 66, 26 N.E.3d 1092 (2015). But the fact that one judge properly exercised his discretion to admit expert testimony in one case does not mean that another judge abused his discretion by excluding similar testimony in a different case. We have reviewed the voir dire testimony of the defendant's expert witness and conclude that the judge did not abuse his discretion by determining that the proffered testimony would not have aided the finder of fact in the circumstances of this case. Moreover, after the judge ruled on the motion in limine, the defendant waived her right to a jury trial and proceeded before the same judge. Where an experienced judge of the Juvenile Court sat as the finder of fact in the defendant's case, we cannot perceive any prejudice to the defendant in his decision to preclude this expert testimony in the circumstances of this case.
Conclusion. The evidence against the defendant proved that, by her wanton or reckless conduct, she caused the victim's death by suicide. Her conviction of involuntary manslaughter as a youthful offender is not legally or constitutionally infirm. The judgment is therefore affirmed.
So ordered.

We acknowledge the amicus briefs submitted by the Youth Advocacy Division of the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers, and by the American Civil Liberties Union and the American Civil Liberties Union of Massachusetts.

Voluminous text messages between the defendant and victim -- apparently their entire text history -- were admitted in evidence.

For example, on July 7, 2014, between 10:57 p.m. and 11:08 p.m. , they exchanged the following text messages:
Defendant : "Well there's more ways to make CO. Google ways to make it...."
Victim : "Omg"
Defendant : "What"
Victim : "portable generator that's it"
Defendant : "That makes CO?"
Victim : "yeah! It's an internal combustion engine."
Defendant : "Do you have one of those?"
Victim : "There's one at work."
Similarly, on July 11, 2014, at 5:13 p.m. , the defendant sent the victim the following text message: "... Well in my opinion, I think u should do the generator because I don't know much about the pump and with a generator u can't fail"
See Commonwealth v. Carter, 474 Mass. 624, 626 n.4, 52 N.E.3d 1054 (2016) (Carter I ).

During the evening of July 11 and morning of July 12, 2014, the victim and the defendant exchanged the following text messages:
Victim : "I have a bad feeling tht this is going to create a lot of depression between my parents/sisters"
...
Defendant : "I think your parents know you're in a really bad place. Im not saying they want you to do it, but I honestly feel like they can except it. They know there's nothing they can do, they've tried helping, everyone's tried. But there's a point that comes where there isn't anything anyone can do to save you, not even yourself, and you've hit that point and I think your parents know you've hit that point. You said you're mom saw a suicide thing on your computer and she didn't say anything. I think she knows it's on your mind, and she's prepared for it"
Defendant : "Everyone will be sad for a while, but they will get over it and move on. They won't be in depression I won't let that happen. They know how sad you are and they know that you're doing this to be happy, and I think they will understand and accept it. They'll always carry u in their hearts"
...
Victim : "i don't want anyone hurt in the process though"
Victim : "I meant when they open the door, all the carbon monoxide is gonna come out they can't see it or smell it. whoever opens the door"
Defendant : "They will see the generator and know that you died of CO...."
...
Victim : "Idk I'm freaking out again"
...
Defendant : "I thought you wanted to do this. The time is right and you're ready, you just need to do it! You can't keep living this way. You just need to do it like you did last time and not think about it and just do it babe. You can't keep doing this every day"
Victim : "I do want to. but like I'm freaking for my family. I guess"
Victim : "idkkk"
Defendant : "Conrad. I told you I'll take care of them. Everyone will take care of them to make sure they won't be alone and people will help them get thru it. We talked about this, they will be okay and accept it. People who commit suicide don't think this much and they just do it"
See Carter I, 474 Mass. at 627 n.5, 52 N.E.3d 1054.

On July 12, 2014, between 4:25 a.m. and 4:34 a.m. , they exchanged the following text messages:
Defendant : "So I guess you aren't gonna do it then, all that for nothing"
Defendant : "I'm just confused like you were so ready and determined"
Victim : "I am gonna eventually"
Victim : "I really don't know what I'm waiting for .. but I have everything lined up"
Defendant : "No, you're not, Conrad. Last night was it. You keep pushing it off and you say you'll do it but u never do. Its always gonna be that way if u don't take action"
Defendant : "You're just making it harder on yourself by pushing it off, you just have to do it"
Defendant : "Do u wanna do it now?"
Victim : "Is it too late?"
Victim : "Idkk it's already light outside"
Victim : "I'm gonna go back to sleep, love you I'll text you tomorrow"
Defendant : "No? Its probably the best time now because everyone's sleeping. Just go somewhere in your truck. And no one's really out right now because it's an awkward time"
Defendant : "If u don't do it now you're never gonna do it"
Defendant : "And u can say you'll do it tomorrow but you probably won't"
See Carter I, 474 Mass. at 626 n.4, 52 N.E.3d 1054.
At various times between July 4 and July 12, 2014, the defendant and the victim exchanged several similar text messages:
Defendant : "You're gonna have to prove me wrong because I just don't think you really want this. You just keeps pushing it off to another night and say you'll do it but you never do"
...
Defendant : "SEE THAT'S WHAT I MEAN. YOU KEEP PUSHING IT OFF! You just said you were gonna do it tonight and now you're saying eventually...."
...
Defendant : "But I bet you're gonna be like 'oh, it didn't work because I didn't tape the tube right or something like that' ... I bet you're gonna say an excuse like that"
...
Defendant : "Do you have the generator?"
Victim : "not yet lol"
Defendant : "WELL WHEN ARE YOU GETTING IT"
...
Defendant : "You better not be bull shiting me and saying you're gonna do this and then purposely get caught"
...
Defendant : "You just need to do it Conrad or I'm gonna get you help"
Defendant : "You can't keep doing this everyday"
Victim : "Okay I'm gonna do it today"
Defendant : "Do you promise"
Victim : "I promise babe"
Victim : "I have to now"
Defendant : "Like right now?"
Victim : "where do I go? :("
Defendant : "And u can't break a promise. And just go in a quiet parking lot or something" (emphasis added).
See Carter I, 474 Mass. at 628 n.6, 52 N.E.3d 1054.

During that same time period, the defendant carried out what the prosecutor called a "dry run." On July 10 -- two days before the victim's suicide -- the defendant sent text messages to two friends, stating that the victim was missing, that she had not heard from him, and that his family was looking for him. She sent similar messages to those friends the following day, stating that the victim was still missing and that she was losing hope. In fact, at that time, the defendant was in communication with the victim and knew he was not missing. She also asked a friend in a text message, "Is there any way a portable generator can kill you somehow? Because he said he was getting that and some other tools at the store, and he said he needed to replace the generator at work and fix stuff ... but he didn't go to work today so I don't know why he would have got that stuff." In fact, the defendant and the victim had previously discussed the use of a generator to produce carbon monoxide. As the Commonwealth argued at trial, this dry run demonstrated the defendant's motive to gain her friends' attention and, once she had their attention, not to lose it by being exposed as a liar when the victim failed to commit suicide. Arguably, these desires caused her to disregard the clear danger to the victim.

The defendant eventually texted the victim's sister, but not until 10:18 p.m. , more than two hours after the second lengthy phone call with the victim. In that text, the defendant asked, "Do you know where your brother is?", and did not explain what she knew about the victim.

The defendant suggests that she was indicted for involuntary manslaughter based on wanton or reckless conduct, but wrongly convicted based on a wanton or reckless failure to act. In our view, the indictment charging the defendant with manslaughter "by wanton and reckless conduct" subsumed both theories. See Commonwealth v. Pugh, 462 Mass. 482, 497, 969 N.E.2d 672 (2012), quoting Commonwealth v. Welansky, 316 Mass. 383, 399, 55 N.E.2d 902 (1944) ("the requirement of 'wanton or reckless conduct' may be satisfied by either the commission of an intentional act or an intentional 'omission where there is a duty to act' "). Moreover, it is clear from the judge's findings that the conviction was not based solely on a failure to act but also on the defendant's affirmative conduct, namely, directing the victim to get back in the truck.

There is no question in this case that the Commonwealth proved beyond a reasonable doubt that the defendant engaged in wanton or reckless conduct, that is, "intentional conduct ... involv[ing] a high degree of likelihood that substantial harm will result to another." Pugh, 462 Mass. at 496, 969 N.E.2d 672, quoting Welansky, 316 Mass. at 399, 55 N.E.2d 902. Both the objective and subjective standards discussed above are satisfied. Given the victim's mental illness, his previous suicide attempts, and his suicide plans, there can be no doubt that an ordinary person such as the defendant, his girlfriend who constantly communicated with him, would understand the grave danger to his life, and yet she continued to pressure him to follow through with his plan. The difficult issue before us is not whether the defendant's conduct was wanton or reckless, as this is not a close question, but whether her conduct was the cause of the victim's death.

The defendant characterizes her conduct as merely "encouraging" the victim's suicide. As we have discussed at length, however, it is clear from the judge's findings that she did not merely encourage the victim, but coerced him to get back into the truck, causing his death.

The victim committed suicide by hanging hours before he was to be hanged publicly for his own killing of his father. Commonwealth v. Bowen, 13 Mass. 356, 356 (1816).

The defendant points out that, unlike Massachusetts, several other States, rather than relying on the common law, have enacted statutes prohibiting aiding or assisting suicide and specifying what conduct runs afoul of such statutes. However, the fact that some State Legislatures have chosen to address this problem by statute in no way prevents us from concluding that Massachusetts common law provided the defendant with fair notice that her conduct was prohibited.

As in Commonwealth v. Walters, 472 Mass. 680, 690 n.26, 37 N.E.3d 980 (2015), S.C., 479 Mass. 277, 94 N.E.3d 764 (2018), we apply the same analysis under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights.

Crimes committed using text messages or other electronic communications are treated no differently. See Walters, 472 Mass. at 696, 37 N.E.3d 980 (threat conveyed by "telecommunication device or electronic communication device" would not receive First Amendment or art. 16 protection [citation omitted] ); Commonwealth v. Johnson, 470 Mass. 300, 312, 21 N.E.3d 937 (2014) (there is no First Amendment protection for electronic communications and Internet postings used to commit harassment).

In Carter I, 474 Mass. at 636, 52 N.E.3d 1054, we stated: "It is important to articulate what this case is not about. It is not about a person seeking to ameliorate the anguish of someone coping with a terminal illness and questioning the value of life. Nor is it about a person offering support, comfort, and even assistance to a mature adult who, confronted with such circumstances, has decided to end his or her life. These situations are easily distinguishable from the present case, in which the grand jury heard evidence suggesting a systematic campaign of coercion on which the virtually present defendant embarked -- captured and preserved through her text messages -- that targeted the equivocating young victim's insecurities and acted to subvert his willpower in favor of her own."

Unlike in Carter I, 474 Mass. at 636 n.18, 52 N.E.3d 1054, the defendant raised this claim at trial by moving for a required finding of not guilty on this ground (among others). The judge denied the motion without stating his reasons, making it unclear to us whether he rejected a "reasonable juvenile" standard as a matter of law, determined that the evidence would be sufficient to establish the defendant's guilt under a "reasonable juvenile" standard, or determined that, regardless of whether an objective "reasonable juvenile" standard was proper, the evidence was sufficient to establish her guilt under a subjective standard. The defendant did not press for a "reasonable juvenile" standard in her closing argument. The Commonwealth does not claim that the issue was not preserved.