SUPERIOR COURT 
 
 COMMONWEALTH vs. PETER SCHAP

 
 Docket:
 2281CR0035
 
 
 Dates:
 November 8, 2022
 
 
 Present:
 David A. Deakin
 
 
 County:
 MIDDLESEX
 

 
 Keywords:
 MEMORANDUM AND ORDER ON DEFENDANT’S MOTION TO DISMISS
 
 

             The defendant, Peter Schap, is charged with murder and larceny from a building in connection with the death of Kevin Bergeron on or around July 7, 2020. Bergeron’s body was found in his apartment in Marlborough after employees of a social services program from which he received services called the Marlborough Police Department to report that they had not seen him for a week. When police entered Bergeron’s apartment to check on him, they found his lifeless, partially decomposed body on the floor. The cause of Bergeron’s death was not immediately apparent, and the medical examiner who performed the autopsy determined that the cause and manner of death were undetermined. On October 11, 2020, Schap went to the police station in Marlborough to confess to Bergeron’s murder. His confession included several details about the investigation that had not been reported in the media. Schap was then charged with the murder.
            Schap brought a Motion to Dismiss (Filed Under Seal) (“Motion” or “Motion to Dismiss,” Paper No. 14). In it, he argues that the corroboration rule, which precludes a conviction based on an uncorroborated confession, see Commonwealth v. Forde, 392 Mass. 453 (1984), requires that the indictment be dismissed. Schap argues that, under Forde and its
 
                                                            -1-
 
progeny, a conviction cannot be based on a confession to a crime unless there is evidence corroborating “the corpus delicti.” Commonwealth v. Gibson, 489 Mass. 37, 52 (2022). Schap urges this court to look beyond the formulation, repeated by the Commonwealth’s appellate courts, that, “[i]n a homicide case, the [corroboration] rule is satisfied by evidence that the alleged victim is dead.” Id., citing Forde, 392 Mass. at 458; Commonwealth v. Burgos, 470 Mass. 133, 147 (2014). Instead, Schap contends that the rule actually requires some corroboration of foul play – that is, evidence that “the crime of murder occurred.” Id. at 52 n.34, quoting Burgos, 470 Mass. at 147. Schap finally contends that, under that standard, the Commonwealth presented the grand jury with insufficient evidence to corroborate his confession. See Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982) (court’s review of grand jury evidence limited to whether grand jury received evidence sufficient to establish “probable cause to arrest”). The Commonwealth, for its part, argues that the corroboration rule requires only evidence that the alleged victim is, in fact, dead.
            Under the circumstances of this case – in which there is evidence of a violent struggle and in which other evidence corroborates Schap’s confession – I need not address whether the defendant’s version of the rule or the Commonwealth’s is correct. That is because, under either interpretation of the rule, the Commonwealth presented sufficient evidence to the grand jury to corroborate Schap’s confession to having killed Bergeron. The Motion to Dismiss is, therefore,
DENIED.
BACKGROUND[1]
            When police entered Bergeron’s apartment on July 14, 2020, they found it in disarray. The victim was lying on his back on the living room floor with his hands raised above his
 
--------------------------------------------
 
[1] The facts relevant to the Motion to Dismiss are largely, if not entirely, undisputed. Additional facts appear in the Analysis section as necessary to provide context.
 
                                                            -2-
 
shoulders. A ligature was found around his neck, and a “mini” seven-ounce Corona bottle was lodged in his mouth. Amid the clutter in the living room was a weight bench and several weightlifting “bars.” The condition of Bergeron’s body precluded the police from determining whether there were any signs of trauma. A forensic pathologist (“medical examiner”) from the Office of the Chief Medical Examiner of Massachusetts (“OCME”), Michele Matthews, M.D., conducted an autopsy and, at least initially, was unable to determine the cause and manner of death.
            In October, when Schap went to the Marlborough Police station to confess to having killed Bergeron, he gave a series of detailed statements to several police officials. The first person to whom he spoke was Sergeant Kenneth McKenzie, who began the conversation by advising Schap of his rights under Miranda v. Arizona, 384 U.S. 436, 467-474 (1966). Schap told McKenzie that, roughly four months earlier, he had met a man (apparently someone he did not know), hit it off with him, and gone with the man to his apartment to drink Corona beer together.[2] As they drank, according to Schap, the man began to discuss his interest in sex with children and child pornography. This angered Schap, who reported that he has a young son. Schap told McKenzie that he had struck the man in his arm, shoulder, and head with a weightlifting bar and then put his hands around the man’s neck and squeezed. Schap reported that he did not think that the man was alive when he left the apartment.
            Detective Michael Giaquinto arrived at the police station and joined McKenzie in interviewing Schap, who described the same events that he had recounted to McKenzie, adding some detail. Among other information, Schap told them that, before leaving the apartment, he
 
--------------------------------------------
 
[2] Schap recalled the approximate date of the alleged murder with reference to an incident, at around the same time, in which he had stolen a truck in Marlborough and driven it around for a time before parking it at the Royal Crest Apartments on Hosmer Street in Marlborough. This was the apartment complex in which Bergeron lived.
 
                                                            -3-
 
put an empty Corona beer bottle in the man’s mouth to “silence the virus.” He also told police that he had taken a necklace with a cross on it from the apartment.
            Thereafter, Massachusetts State Police Trooper Constantino Degisi, who had investigated Bergeron’s death on July 14, 2020, came to the Marlborough Police station to interview Schap further. His interview, in which Detective Giaquinto also participated, was recorded on video. Schap provided some additional detail in this third statement, including that he had “smashed [the victim] as hard as he could in the head” and was “trying to squeeze the life out of him” to protect children. After this interview, Trooper Degisi and Detective Giaquinto asked Schap whether they could accompany him to his mother’s home to recover the necklace that he had admitted taking from the apartment. Schap consented, and the police went with him to his mother’s residence. There, Schap gave police a necklace with a religious cross that he took from his nightstand. Police later were able to link the necklace to Bergeron.
            Police conveyed the new information to the medical examiner. She issued an updated autopsy report that reflected her conclusion that Bergeron’s death was a homicide and was caused by asphyxia by upper airway obstruction by another.
            The grand jury returned the indictment in this case on February 11, 2022, and the defendant was arraigned in this court on February 23, 2022. The defendant filed his Motion to Dismiss on May 24, 2022, and the Commonwealth filed its Opposition to Defendant’s Motion to Dismiss (“Opposition,” Paper No. 17) on August 9, 2022. I held a hearing on the Motion on August 26, 2022, and took it under advisement. On September 8, 2022, Schap filed the Defendant’s Supplementary Memorandum of Law in Support of Motion to Dismiss (Paper No. 19), and, on September 15, 2022, the Commonwealth its Supplemental Opposition to Defendant’s Motion to Dismiss (Paper No. 21).
 
                                                            -4-
 
ANALYSIS
            The Massachusetts grand jury performs two basic functions. It is an accusatory body, but it is also the component of the judicial system that protects individuals against “hasty, malicious and oppressive prosecutions.” Jones v. Robbins, 74 Mass. 329, 343-344 (1857). Because its essential functions are to investigate crimes and, if appropriate, charge those responsible, it is not the grand jury’s responsibility to determine the guilt or innocence of the accused or even to test the adequacy of the evidence to sustain a finding of guilt. See Commonwealth v. Moran, 453 Mass. 880, 884 (2009); Commonwealth v. Goldstein, 54 Mass. App. Ct. 863, 868 (2002).
            Generally, therefore, “a court will not review the competency or sufficiency of the evidence before a grand jury.” Commonwealth v. O’Dell, 392 Mass. 445, 450 (1984). Accord Commonwealth v. Coonan, 428 Mass. 823, 825 (1999). The court will assess, however, whether the grand jury received evidence sufficient to establish “probable cause to arrest,” and whether the integrity of the proceedings was impaired. O’Dell, 392 Mass. at 446-447; McCarthy, 385 Mass. at 163. To support an indictment, therefore, a grand jury must receive evidence sufficient to establish the identity of the accused and probable cause to arrest the accused for the indicted offense. See Coonan, 428 Mass. at 825; O’Dell, 392 Mass at 450; McCarthy, 385 Mass. at 163.
            The evidentiary threshold necessary to establish probable cause is significantly lower than that required to prove a charge beyond a reasonable doubt. “Probable cause requires more than mere suspicion but something less than evidence sufficient to warrant a conviction.” Commonwealth v. Hason, 387 Mass. 169, 174 (1982); Commonwealth v. Roman, 414 Mass. 642, 643 (1993). The standard is met when the evidence demonstrates that the police had sufficient reasonably trustworthy information to cause a reasonable person to believe that the accused committed the crime. See Hason, 387 Mass. at 174. A court reviewing the sufficiency of the
 
                                                            -5-
indictment must view the evidence presented to the grand jury “in the light most favorable to the Commonwealth.” Commonwealth v. Barbosa, 477 Mass. 658, 675 (2017), citing Moran, 453 Mass. at 885.
            The corroboration rule provides that a defendant cannot be convicted based solely on the defendant’s confession. The rule thus requires “that there be some evidence, besides the confession, that the criminal act was committed by someone, that is, that the crime was real and not imaginary.” Commonwealth v. Carter, 481 Mass. 352, 361 (2019), quoting Forde, 392 Mass. at 458. The Supreme Judicial Court has repeatedly held that, “in a homicide case, the corroborating evidence need only tend to show that the alleged victim is dead.” Id., quoting Forde, 392 Mass. at 458.
            As there is no dispute that the victim in this case, Kevin Bergeron, is dead, it would seem that little additional analysis is required to apply the corroboration rule in this case. Schap, however, urges me to pause and linger a bit longer over the issue. In Schap’s view, the application of the corroboration rule to a homicide is not as clearcut as the language in Carter, Forde, and other cases[3] suggest. Schap contends that, in every homicide case in which the Supreme Judicial Court has held that the victim’s death satisfies the corroboration rule, there has been independent evidence that the death was, in fact, a homicide. Schap further canvasses Massachusetts corroboration rule cases across all crimes. In his reading of those cases, the Commonwealth’s appellate courts have held that there must be some evidence – beside the defendant’s confession – that a crime was committed. In Schap’s view, because the medical
 
--------------------------------------------
 
[3] See Commonwealth v. Weaver, 474 Mass. 787, 791 (2016) (declining to expand corroboration rule to require evidence, beyond confession, linking defendant to crime); Commonwealth v. Burgos, 470 Mass. 133, 147 (2014) (“In a murder case, the additional evidence [required to satisfy the corroboration rule] ‘need only tend to show that the alleged victim is dead.’”), quoting Forde, 392 Mass. at 458.
 
                                                            -6-
 
examiner who conducted the autopsy in this case could not determine the cause and manner of death until the defendant confessed to killing Bergeron, there was no evidence of a homicide without that confession.
            To resolve Schap’s Motion to Dismiss, I do not have to decide whether the corroboration rule requires evidence – beyond the confession – that the victim’s death was the result of foul play.[4] That is because, in this case, even if I applied the defendant’s proposed enhanced version
 
--------------------------------------------
 
[4] If I were required to address Schap’s contention that something more than a death is required to satisfy the corroboration rule in a homicide case, I would reject it, in any event. In Commonwealth v. Manning, 41 Mass. App. Ct. 18, 20 (1996), the Appeals Court expressly rejected the principle advocated for by the defendant in this case. The Manning Court observed that, because
the purpose of the [corroboration] rule is “to guard against conviction for imaginary crimes,” the Supreme Judicial Court adopted an orthodox definition of “corpus delicti” as meaning merely “the specific kind of loss or injury embraced in the crime charged” and not requiring also evidence of a criminal agency as the source of that loss or injury. . . . “Thus, in a homicide case, the corroborating evidence need only tend to show that the alleged victim is dead.”
41 Mass. App. Ct. at 20, quoting Forde, 392 Mass. at 458.
More recently, in Weaver, 474 Mass. at 791-792, the Supreme Judicial Court considered, and rejected, an analogous argument. In Weaver, there was no question that the shooting death was a homicide. The juvenile defendant, however, argued that there was no evidence, beside his confession, to link him to the shooting. He, therefore, asked the SJC “to reconsider expanding the corroboration rule as it applies to juvenile confessions in light of research that juveniles are more likely than adults to confess to crimes they did not commit . . . ” Weaver, 474 Mass. at
791. The SJC rejected the juvenile defendant’s request, holding that he had “fail[ed] . . . to articulate why our practice of rigorously examining the voluntariness of a defendant’s confession is an inadequate prophylactic measure against the use of false confessions in securing a conviction.” Id. at 792.
It is certainly true that the holding in Weaver is in tension with the holding in Commonwealth v. Leonard, 401 Mass. 470, 472-473 (1988). In that case, the Supreme Judicial Court held that, because there was no evidence corroborating the defendant’s admission that he drove the automobile in question, his conviction for operating under the influence could not stand. 401 Mass. at 472-473. Leonard, and the other cases cited by Schap for a similar proposition, Commonwealth v. Costello, 411 Mass. 371, 374-376 (1991), and Commonwealth v. Landenburg, 41 Mass. App. Ct. 23, 25 (1996), were all decided at least twenty-five years ago, and none
 
                                                            -7-
 
of the corroboration rule, the evidence would satisfy it. There is, in short, ample evidence uncovered in the investigation that corroborates Schap’s admission to having killed Bergeron.
            Before the grand jury, Detective Giaquinto testified that Schap had confessed to striking the decedent “with a metal bar, some sort of weightlifting bar.” GJ at 29, l. 24 – 30, l. 25.[5] When they executed a search warrant at Bergeron’s home, police found several weightlifting “bars.” Detective Giaquinto further testified that Schap admitted that he struck Bergeron with the metal bar in “his arm, shoulder, and head.” Id. at 30, ll. 4-5. The injury to Bergeron’s head or shoulder observed by the medical examiner at autopsy thus corroborates Schap’s statement that he struck Bergeron with a metal bar.[6]
 
--------------------------------------------
 
involved a homicide. Under the circumstances, I am not persuaded that the Supreme Judicial Court intended its decisions in Leonard or Costello to overrule the Forde holding that, in a homicide case, the putative victim’s death satisfies the corroboration rule.
[5] References to the grand jury minutes of February 9, 2022, which were introduced at the hearing as Exhibit 1, are denoted by the abbreviation, “GJ,” followed by page and line citations.
[6] There is some dispute about whether the injury observed at autopsy was a “sub-scapular hematoma,” as Detective Giaquinto was asked in the grand jury, GJ at 46, ll. 11-12, or a “sub-
scalpular hematoma,” as indicated in the autopsy report. The autopsy report was submitted by the Commonwealth after the hearing, at my request.
Schap contends, in the Defendant’s Supplementary Memorandum of Law in Support of Motion to Dismiss, that a “sub-scapular hematoma” refers to a bruise under the scapula or shoulder blade and that a “sub-scalpular hematoma” refers to a bruise under the scalp. The Commonwealth has not contested this claim, which certainly appears at least likely to be correct. For the sake of the Motion, I accept the contention. This became an issue at the hearing because the assistant district attorney argued that the presence of a sub-scalpular hematoma corroborated Schap’s purported claim that he struck Bergeron over the head with a metal bar. The grand jury minutes, however, reflect that the prosecutor asked Detective Giaquinto about a “sub-scapular hematoma.” G. J. at 46, ll. 11-12. It is possible that this was an error on the prosecutor’s part or, even more likely, a transcription error. The issue is of no consequence, however, as the grand jury minutes reflect that Detective Giaquinto testified that Schap reported having hit Bergeron in “his arm, shoulder, and head.” Id.at 30, ll. 4-5. Thus, a bruise under Bergeron’s scalp or shoulder blade would corroborate Schap’s claim that he struck Bergeron in several areas of his upper body, including his head and shoulder.
 
                                                            -8-
 
            The condition of the apartment, which was in disarray when police arrived, the ligature found around Bergeron’s neck, and the “mini,” seven-ounce Corona bottle lodged in his mouth also corroborate Schap’s account of having killed Bergeron. Thus, even if I were to accept Schap’s invitation to expand the requirements of the corroboration rule in homicide cases to include independent evidence that the death resulted from criminal conduct, I would conclude that the proposed requirement was met in this case.
            Schap’s argument to the contrary is unpersuasive. He contends that, because the medical examiner who performed the autopsy was unable, initially, to determine the cause and manner of death, there was insufficient evidence – aside from his confession – to corroborate that Bergeron’s death was the result of criminal conduct. There are two key flaws in this argument. First, the corroboration rule is a rule of evidence; it has no application to the work of a medical examiner conducting a post-mortem examination. Not surprisingly, therefore, Schap cites no authority for his implicit claim that, to prosecute a homicide, the Commonwealth must establish that the medical examiner was able to determine the cause and manner of death without reference to a defendant’s statements.
            Second, Schap draws an unwarranted conclusion from the medical examiner’s initial determination that the cause and manner of death were undetermined. Although this is correct, it ignores observations noted by the medical examiner on autopsy. As noted, supra, the medical examiner documented: a ligature around Bergeron’s neck, abrasions to his chin and neck, a bruise under either his scalp or shoulder (see note 5, supra), and a bottle in his mouth. The first three of these findings corroborate that there was a struggle, as Schap indicated in his statement to police, and all four of them corroborate Schap’s statement to police about the homicide.
 
                                                            -9-
 
            Further, Schap told police in his statement that, after he killed Bergeron, he took a necklace from the dead man’s apartment. Later – after Schap gave his statement – police went with him to his mother’s apartment. There, Schap handed over to police a necklace that police later linked to Bergeron.
            The corroboration of Schap’s statement is not limited, therefore, to Bergeron’s death. Rather, the medical examiner’s findings, the observations of the police of an apartment in disarray, the bottle found in Bergeron’s mouth, and the recovery of Bergeron’s jewelry all corroborate Schap’s confession. Thus, even if application of the corroboration rule to homicide prosecutions required something more than proof of the decedent’s death – that is, that the death resulted from criminal conduct – the rule’s requirements would be satisfied in this case.
CONCLUSION AND ORDER
            For the foregoing reasons, the Motion to Dismiss is DENIED.
/s/David A. Deakin
Associate Justice
Dated: 
November 8, 2022